### STATE OF CONNECTICUT *v.* DERRICK JAMES TAYLOR
### (15322)

Callahan, C. J., and Berdon, Norcott, Katz and Palmer, Js.

Argued September 25—officially released December 31, 1996

*Hope C. Seeley,* with whom, on the brief, was *Hubert J. Santos,* for the appellant (defendant).

*Christopher T. Godialis,* deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Herbert E. Carlson, Jr.,* senior assistant state's attorney, for the appellee (state).

NORCOTT, J. The principal issue in this appeal is whether the trial court violated the defendant's federal and state constitutional rights to due process of law by delivering a missing witness instruction under *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960), because the defendant had failed to call an available witness. The defendant, Derrick James Taylor, was convicted after a jury trial of the crimes of murder in violation of General Statutes § 53a-54a (a),[1] assault

---

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant

in the first degree in violation of General Statutes § 53a-59 (a) (1),[2] and conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a).[3] The trial court subsequently granted the defendant's motion for a judgment of acquittal with respect to the charge of assault in the first degree and, thereafter, the court substituted a verdict of guilty of assault in the second degree in violation of General Statutes (Rev. to 1993) § 53a-60 (a) (2).[4] The defendant appeals his judgment of conviction to this court pursuant to General Statutes § 51-199 (b) (3).[5] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. During the evening of August 28, 1992, and the early morning of August 29, 1992, the defendant attended a party with members of the Latin Kings on Seymour Street in Hartford. At about 1 a.m., Felix Baez, another guest at the party, asked the defendant to drive

believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] General Statutes (Rev. to 1993) § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[5] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

him on the defendant's motorcycle to the Cambrense Cafe, a bar and restaurant located on New Park Avenue in Hartford. Helder Aguiar, the sixteen year old son of the owner, and Fernando Aguiar, the owner's brother, were working at the cafe that night. Sometime before 1:30 a.m. on August 29, 1992, Baez and the defendant arrived at the cafe on the defendant's motorcycle. Almost immediately after they entered the cafe, Baez began arguing with another patron. Fernando, who was tending bar, asked both Baez and the defendant to leave. The defendant complied, but Baez did not. Fernando then grabbed Baez by the shirt collar and pushed him out the door. The defendant watched but did not take part in the struggle between Baez and Fernando, which continued outside the cafe and ended when Baez was thrown to the sidewalk. The defendant pointed his right index finger at Fernando and said "wait a minute." As he stood up, Baez warned "we'll be back." Baez tried to mount the defendant's motorcycle, but in so doing, he knocked the motorcycle to the ground and broke a handlebar.

The defendant then drove Baez on his motorcycle to Baez' apartment on Madison Street in Hartford. Olga Sorra, a fifteen year old who was baby-sitting Baez' children at his apartment, joined the defendant on his motorcycle after he had dropped off Baez. Sorra and the defendant returned to the party. When they arrived at the party, the defendant asked someone where the "coronas"[6] were, and the defendant was told that they were in the back room. The defendant entered the room

---

[6] Sorra testified at trial that the main reason why a person might ask to speak to a corona would be "[t]o ask permission for anything out of sight or whatever." Sergeant Christopher Lyons, supervisor of the intelligence unit of the Hartford police department, testified that a "corona could be singular or plural. A corona is [a] board of directors which is what the Latin Kings . . . utilize to make decisions, the guys that run the gang." He further testified that "when someone goes to speak [to a corona], it is to get permission to do a certain act or get permission to do something."

and when he came out, he told Sorra that he was leaving, but that he would be back. Soon thereafter, the defendant left the party.

Sometime after 2 a.m., Helder Aguiar stepped outside of the Cambrense Cafe to help Fernando Aguiar look for keys he had lost during the scuffle with Baez. As he stood outside, Helder noticed two people carrying handguns, whose faces were wrapped with T-shirts covering all but their eyes, moving up the south side of the cafe toward Fernando. As Helder yelled to Fernando to warn him of the approaching danger, one of the assailants put his revolver against Fernando's head and the other assailant fired a semiautomatic pistol at Helder and struck him with two bullets. Helder observed that the person who shot him had the same build as the defendant and wore exactly the same clothing from the waist down that the defendant had worn one hour earlier at the cafe. Before he lost consciousness, Helder saw both armed men firing bullets at Fernando as he lay on the sidewalk.

Fitzalbert Williams, a state prisoner on weekend furlough, lived in a third floor apartment at 6 New Park Avenue within view of the cafe. Williams was lying awake in bed sometime after 2 a.m. on August 29, 1992, when he heard two gunshots. Williams went to his window, he opened it, and, as he looked out the window, saw the defendant with a pistol in his hand. Williams testified that nothing obstructed his view, that the lighting was "pretty bright" and that his eyesight was "very good." Williams stated that he saw a "half-front view" of the defendant from the nose back to the right side, and that the defendant was not then wearing anything that covered his face. Williams further testified that he saw "sparks," and then observed the defendant turn in his direction before running away. As the defendant began to run away, Williams saw a second armed person appear and fire gunshots at a person lying on the side-

walk. After firing the shots, the other assailant ran in the same direction as the defendant. The defendant helped the other assailant over a fence, and they both disappeared out of Williams' sight.

At approximately 2:22 a.m. on the morning of August 29, 1992, Hartford police officers Antonio Champion and Carlos Rosario were at the intersection of Park Street and Sisson Avenue when they heard gunshots coming from the direction of New Park Avenue. Both officers responded to the sound of gunfire and ran to the intersection of Park Street and New Park Avenue. Champion saw Fernando Aguiar lying on the ground, having been shot several times in the face and upper part of his body. Both Fernando and Helder Aguiar were taken to Hartford Hospital where Fernando was pronounced dead. The autopsy on Fernando revealed that multiple gunshot wounds to the head and body were the cause of his death. Helder was treated for two gunshot wounds and released.

When Sorra saw the defendant return to the Latin Kings party at approximately 2:30 a.m., the defendant was not riding his motorcycle. Rather, he was a passenger in a Ford Bronco driven by another member of the Latin Kings. Subsequently, Sorra and the defendant were driven to his apartment in Manchester, and Sorra spent the remainder of the night with him. Later that morning, a person who had been at the party the night before came to the defendant's apartment and told the defendant that he should leave town. The defendant filled a suitcase with clothes and left the apartment. Sorra left for Puerto Rico, and she did not see the defendant again until she testified at his trial. Additional facts will be discussed where relevant.

On appeal, the defendant claims that: (1) the trial court denied him due process of law by instructing the jury that it could draw an adverse inference from his

failure to call an alibi witness and identify her, and by allowing the state to argue during its statement to the jury that such an inference should be drawn; (2) the evidence presented by the state was insufficient to support the jury's verdict; (3) the trial court denied him due process of law by refusing to suppress evidence of Williams' pretrial identification of the defendant; (4) the trial court improperly admitted evidence relating to his involvement in gang activity and allowed the state to comment on his gang affiliation in closing argument; and (5) the trial court improperly instructed the jury concerning the standard of proof beyond a reasonable doubt. We are unpersuaded by these claims and, accordingly, we affirm the judgment of the trial court.

I

The defendant first claims that the trial court improperly instructed the jury that it could draw an adverse inference from his failure to call an alibi witness, and that the trial court improperly allowed the state to comment during summation that such an inference should be drawn. In this regard, the defendant challenges the trial court's reliance, in a criminal trial, on the rule set forth by this court in *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675, that the " 'failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause.' " Because he did not object to the trial court's *Secondino* instruction, the defendant did not preserve this claim for appeal. The defendant argues, however, that the *Secondino* instruction violated his federal and state constitutional rights to due process of law and, therefore, that his unpreserved claim merits review under the standard set out in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[7] We disagree.

---

[7] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is

The following additional facts are relevant to the resolution of this claim. The defendant testified at trial that he was with his girlfriend, Michelle Michalski, at the party during the time of the shootings,[8] that he remained at the party with Michalski from 2 a.m. until 4 a.m., and that he left the party at 4 a.m. with Sorra. Although the defendant clearly identified Michalski as an alibi witness, and though Michalski was present throughout his trial, he chose not to call her. The state sought permission to comment on the defendant's failure to call Michalski and requested that the trial court deliver a *Secondino* instruction to the jury. Finding that Michalski both was available to testify and was someone whom the defendant, having implicated her as an alibi witness, would naturally produce, the trial court allowed the state to comment on the defendant's failure to call Michalski as a witness. The trial court further instructed the jury that it could draw an adverse inference from the defendant's failure to call Michalski to corroborate his alibi.

To merit review, a claim of constitutional error not preserved at trial must establish a violation of constitutional magnitude. *State* v. *Golding*, supra, 213 Conn. 239. The defendant argues that by instructing the jury that it could draw an adverse inference from his failure to call Michalski, the trial court diluted the state's burden of proof beyond a reasonable doubt and thereby deprived him of his state and federal constitutional rights to due process of law. The defendant concedes,

adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

[8] Champion testified that the shootings took place at approximately 2:22 a.m. on August 29, 1992.

however, that cases in this court addressing the identical argument that he puts forth consistently have affirmed that "[i]t is not a violation of the defendant's constitutional rights for counsel to refer to the failure of a defendant in a criminal case to call a witness, [or] for the court to charge concerning the failure of a party to call an available witness who would naturally be produced by that party . . . ." *State* v. *Annunziato*, 169 Conn. 517, 538, 363 A.2d 1011 (1975); see *State* v. *Greene*, 209 Conn. 458, 470, 551 A.2d 1231 (1988); *State* v. *Shashaty*, 205 Conn. 39, 43–44, 529 A.2d 1308 (1987), cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988); *State* v. *Daniels*, 180 Conn. 101, 108–109, 429 A.2d 813 (1980); *State* v. *Peary*, 176 Conn. 170, 182, 405 A.2d 626 (1978), cert. denied, 441 U.S. 966, 99 S. Ct. 2417, 60 L. Ed. 2d 1072 (1979). More significantly, this court has held that "[a] party who fails to make a timely objection to the giving of a *Secondino* charge will be deemed to have waived the issue for appeal. The giving of a *Secondino* charge is purely an evidentiary issue and is not a matter of constitutional dimensions." *State* v. *Anderson*, 212 Conn. 31, 41–42, 561 A.2d 897 (1989).

Further, the majority of other jurisdictions subscribe to our view that, when the defendant chooses to advance a defense but fails to call a witness whom he would be expected to produce, the trial court's delivery of a missing witness instruction does not vitiate the criminal defendant's due process rights. See, e.g., *Graves* v. *United States*, 150 U.S. 118, 121, 14 S. Ct. 40, 37 L. Ed. 1021 (1893) ("[t]he rule even in criminal cases is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable"); *United States* v. *Wright*, 845 F. Sup. 1041, 1066 (D.N.J.) (same), aff'd, 46 F.3d 1120 (3d Cir.

1994); *State* v. *Wilkins*, 215 Kan. 145, 150–51, 523 P.2d 728 (1974) ("[w]hen the theory of the defense is based upon facts within the personal knowledge of a particular person or persons available as witnesses and no attempt to secure their testimony is made the failure to produce available [testimony] may give rise to an inference that it would be adverse to the party who would have produced it"); *People* v. *Fields*, 450 Mich. 94, 115, 538 N.W.2d 356 (1995) ("[a]lthough a defendant has no burden to produce any evidence, once the defendant advances evidence or a theory, argument on the inferences created does not shift the burden of proof"); *State* v. *Reese*, 860 S.W.2d 848, 850 (Mo. 1993) (where defendant introduced evidence of alibi witness who was expected to testify favorably, failure to call witness "may give rise to an inference that his testimony would actually have been unfavorable rather than favorable"); *People* v. *Wilson*, 64 N.Y.2d 634, 635–36, 474 N.E.2d 248, 485 N.Y.S.2d 40 (1984) ("[a]lthough defendant had no burden to come forward with alibi evidence, once he did so, his failure to call an available witness to support the alibi could be brought to the jury's attention"); *People* v. *Rodriguez*, 38 N.Y.2d 95, 98–99, 341 N.E.2d 231, 378 N.Y.S.2d 665 (1975) ("respected authorities make clear that, so long as comment or instruction on the absence of the witness is unaccompanied by [comment] on the accused's personal failure to testify, no constitutional right is infringed"); *State* v. *Blair*, 117 Wash. 2d 479, 487, 816 P.2d 718 (1991) ("missing witness doctrine [is] applicable where the inference was drawn based on defendant's failure to call a particular witness").

These cases rely on a common rationale for treating a missing witness charge as a nonconstitutional evidentiary matter, when a defendant chooses to assert an alibi defense through his own testimony or that of other witnesses. When it delivers a *Secondino* instruction,

the trial court authorizes but does not require the jury to draw an adverse inference from a party's failure to call a witness who is available and whom a party naturally would be expected to produce. Because the requested inference is a permissive rather than a mandatory one—that is, one which the jury at all times is free to accept or to reject—a *Secondino* instruction does not shift or diminish the state's burden of proving the defendant's guilt beyond a reasonable doubt. It is true that because a criminal defendant bears no burden of proof and no obligation to present any witnesses, the state is barred from seeking a *Secondino* charge if a defendant chooses not to testify or to call any witnesses. *State* v. *Daniels*, supra, 180 Conn. 108–109; *State* v. *Annunziato*, supra, 169 Conn. 538–39. We conclude that this prohibition does not apply in the present case, however, because the defendant, in fact, testified. The defendant testified and implicated Michalski as an alibi witness. He therefore stood subject to the state's use of the *Secondino* rule to expose the infirmities of his defense.

Similarly, we are unpersuaded by the defendant's claim that it was improper for the state to comment in closing argument about his failure to call Michalski. "When counsel for either the state or the defendant intends to argue to the jury that an unfavorable inference be drawn from the absence of a witness at trial, an advance ruling from the court should be sought and obtained. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson*, supra, 212 Conn. 41. Given our resolution herein of the constitutional challenge to the *Secondino* jury instruction, and in light of the fact that the state both properly sought permission to comment on the defendant's failure to call Michalski and requested that a *Secondino* charge be given, we hold that the state's argument to the jury was proper.

"[O]nce identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed." *State* v. *Golding*, supra, 213 Conn. 241. We conclude that, because the defendant's unpreserved claim is not one "of constitutional magnitude alleging the violation of a fundamental right"; id., 239; it does not merit review by this court.[9]

## II

The defendant next claims that there was insufficient evidence to convict him of the crimes for which he was charged. Specifically, the defendant argues that there was insufficient evidence of his identity as the perpetrator of the three crimes of which he was convicted, and to support his conviction of conspiracy to commit murder. We disagree.

In reviewing the defendant's claims of evidentiary insufficiency, this court applies a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994). The defendant first argues that there was insufficient evidence of his identity as the perpetrator of the crimes on the ground that no reasonable jury could have believed the testimony of Williams. In this regard, the defendant contends that, although Williams made an in-court identification of the defendant at trial during direct examination, Williams

[9] We are aware that the vitality of the *Secondino* rule in both civil and criminal cases continues to be questioned. See *Hines* v. *St. Vincent's Medical Center*, 232 Conn. 632, 644–45, 657 A.2d 578 (1995) (*Palmer, J.*, concurring), quoting C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1994) § 11.5.4, pp. 150–51. Given the circumstances of this case, we leave for another day a full consideration of the merits of the *Secondino* rule as a matter of policy.

admitted on cross-examination to having stated at the October 5, 1994 probable cause hearing that he was not certain whether the person he saw on the street on August 29, 1992, was the defendant. By requesting that this court assess Williams' testimony in this manner, however, the defendant misconceives the scope of our review on appeal of a claim of insufficient evidence. "We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . *State* v. *Henning*, 220 Conn. 417, 420, 599 A.2d 1065 (1991). This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986). . . . *State* v. *Mejia*, [233 Conn. 215, 224, 658 A.2d 571 (1995)]." (Internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 258, 681 A.2d 922 (1996). "If there is any reasonable way that the jury might have reconciled the conflicting testimony before them, we may not disturb their verdict." *State* v. *Myers*, 193 Conn. 457, 473, 479 A.2d 199 (1984). We conclude that the jury reasonably could have reconciled any apparent conflict in Williams' testimony. At trial, Williams denied that he had testified at the probable cause hearing that he was uncertain whether the defendant was the person whom he had seen during the early morning hours of August 29, 1992. When defense counsel tried to impeach Williams with the transcript of the probable cause hearing, Williams clarified that, at the probable cause hearing, he had only been asked whether the defendant, as he then appeared in person, looked the same as he did the night of the shootings.

Other evidence heard by the jury reasonably could have led the jury to its determination that the defendant

committed the crimes with which he was charged. Ten days after the shootings, in the presence of police detectives, Williams identified the defendant from a photographic array, and at trial Williams made an unequivocal in-court identification of the defendant as one of the perpetrators. In addition, the testimony of Helder Aguiar corroborated Williams' description of what transpired on August 29, 1992. Helder made an in-court identification of the defendant and testified that there was no recognizable difference between the height, build and dress of the defendant, whom Helder had observed at the cafe earlier on the evening of the shootings, and that of one of the assailants. Moreover, the testimony of Sorra left the defendant's whereabouts unaccounted for during the time of the shootings and also revealed that the defendant was advised to leave town and did so forthwith. We conclude, therefore, that viewed in the light most favorable to sustaining the verdict, the cumulative force of the evidence could have led the jury reasonably and logically to conclude beyond a reasonable doubt that the defendant was one of the perpetrators of the crimes for which he was charged.

The defendant also contends that the evidence was insufficient to convict him of conspiracy to commit murder. Specifically, the defendant argues that the state failed to establish that he had entered into an agreement with any other person. We disagree. "To establish the crime of conspiracy [to commit murder in violation of §§ 53a-54a and 53a-48, the state must show] that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . While the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express

agreement to unite to accomplish an unlawful purpose." (Internal quotation marks omitted.) *State* v. *Pinnock*, 220 Conn. 765, 771–72, 601 A.2d 521 (1992). "[T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." *State* v. *Crosswell*, 223 Conn. 243, 256, 612 A.2d 1174 (1992). "Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. *State* v. *Faillace*, 134 Conn. 181, 185, 56 A.2d 167 (1947)." (Internal quotation marks omitted.) *State* v. *Patterson*, 213 Conn. 708, 722, 570 A.2d 174 (1990).

In accordance with these principles, we find that there was sufficient evidence in the present case to allow the jury to determine that the state had proved beyond a reasonable doubt that the defendant conspired to murder Fernando Aguiar. Helder Aguiar testified that he had observed two armed persons with masked faces "sneaking up" on them just before he and Fernando were shot. Helder further testified that one armed person ran up to Fernando and put a revolver to his head, the other shot Helder twice, in the shoulder and the arm respectively, and both gunmen then fired several more shots at Fernando's head and torso. Before he lost consciousness, Helder saw both gunmen standing over his uncle shooting him. Williams identified one of the gunmen as the defendant, and he testified that he saw the defendant wait for and then assist his companion, the other assailant, over a fence as the two ran from the scene together. Such evidence clearly demonstrates the coordinated actions of the defendant and the other assailant, and it is more than sufficient to allow the jury reasonably to infer both that a felonious agreement existed between the two, and that they carried out an overt act in furtherance of that agreement.

## III

The defendant next claims that the trial court violated his state and federal constitutional rights to due process of law by denying his pretrial motions to suppress Williams' identification of him as one of the assailants. The defendant argues that the photographic array from which Williams identified the defendant was impermissibly suggestive, and that Williams' resulting pretrial identification, therefore, was unreliable. We disagree.

The following additional facts are relevant to the resolution of this issue. On September 8, 1992, Williams viewed an array of eight photographs, including one of the defendant. Williams selected the defendant's photograph as resembling one of the assailants present at the August 29, 1992 shooting outside the Cambrense Cafe. Prior to trial, the defendant moved to suppress Williams' pretrial identification of the defendant from the photographic array on the grounds that it was unnecessarily suggestive, and that it failed to meet the standard of reliability set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). At a hearing before the trial court and outside the presence of the jury, the defendant moved to suppress the pretrial identification claiming that, prior to selecting the defendant's photograph, Williams had seen a notation on the back of the photographic array indicating that Baez had selected photograph number two, the defendant's photograph, as that of the perpetrator. The trial court determined that Williams had not seen the back of the photographic array until after he had made the identification of the defendant's photograph, and concluded that there was nothing suggestive in the composition of the array. The court thereby denied the defendant's suppression motion and allowed the pretrial identification to be admitted into evidence.

The defendant did not object to the trial court's ruling and, therefore, did not preserve his claim for appeal.

The defendant now claims that the photographic array was unnecessarily suggestive, because there was a unique difference between his photograph and the others, which guaranteed that his photograph would be selected. Although the defendant did not previously challenge the composition of the array, he requests review under *State* v. *Golding*, supra, 213 Conn. 239–40, as a constitutional violation of due process of law.

We note at the onset that " '[b]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . .' *State* v. *Howard*, 221 Conn. 447, 454, 604 A.2d 1294 (1992)." (Citation omitted.) *State* v. *Figueroa*, 235 Conn. 145, 155, 665 A.2d 63 (1995). This court has adopted the federal standard set forth in *Neil* v. *Biggers*, supra, 409 U.S. 199–200, for determining whether a pretrial identification procedure violated a defendant's due process rights. "[T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. *State* v. *Tatum*, 219 Conn. 721, 727, 595 A.2d 322 (1991), quoting *State* v. *Theriault*, 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see also *State* v. *Ramsundar*, 204 Conn. 4, 10, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987). To prevail in his claim, the defendant must demonstrate that the trial court erred in both of its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances. . . . *State* v. *Hinton*, [196 Conn. 289, 293, 493 A.2d 836 (1985)]. *State* v. *Mayette*, 204

Conn. 571, 581, 529 A.2d 673 (1987). *State* v. *Pollitt*, 205 Conn. 132, 162, 531 A.2d 125 (1987). . . . *State* v. *Wooten*, 227 Conn. 677, 685, 631 A.2d 271 (1993)." (Internal quotation marks omitted.) *State* v. *Figueroa*, supra, 155–56. "An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." *State* v. *White*, 229 Conn. 125, 161–62, 640 A.2d 572 (1994). "If the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable. *State* v. *Williams*, [203 Conn. 159, 173–74, 523 A.2d 1284 (1987)]; *State* v. *Miller*, [202 Conn. 463, 470, 522 A.2d 249 (1987)]; *State* v. *Amarillo*, 198 Conn. 285, 294, 503 A.2d 146 (1986)." *State* v. *Boscarino*, 204 Conn. 714, 726, 529 A.2d 1260 (1987).

On our review of the record, we conclude that the presentation of the photographic array to Williams did not constitute an impermissibly suggestive pretrial identification procedure. The defendant claims that his photograph was glossier and brighter than all but one of the others in the array, thus ensuring that Williams would select it. The defendant concedes, however, that his photograph was not the only one like it in the array. " 'Any array composed of different individuals must necessarily contain certain differences.' *State* v. *Vaughn*, 199 Conn. 557, 564, 508 A.2d 430 (1986). . . . Differences in the size and color composition of photographs 'in and of themselves do not render an array . . . unnecessarily suggestive.' *State* v. *McKnight*, 191 Conn. 564, 571, 469 A.2d 397 (1983); *State* v. *Davis*, 175 Conn. 250, 254, 397 A.2d 1347 (1978)." *State* v. *Boscarino*, supra, 204 Conn. 726–27. In the photographic array, the defendant was depicted with seven other males who appeared to be approximately his age, and each of whom had a mustache and dark hair as did the defendant. We note that there exists no constitutional

mandate that gives the defendant the right to a photographic array of look-alikes. Because the defendant's photograph was not dissimilar in any meaningful way from the others in the array, and because there is absolutely no evidence of unfairness or other impropriety in the presentation of the array, we conclude that the claim does not meet the third requirement of *Golding*, namely that the alleged violation clearly exists and clearly deprived the defendant of a constitutional right. The defendant's claim, therefore, must fail.

IV

The defendant also argues that the trial court deprived him of a fair trial by allowing the state to introduce testimony relating to his membership in the Latin Kings, and by allowing the state to refer during its closing argument to the defendant's alleged gang activity. Although the defendant did not challenge at trial either the testimony regarding gang activities, or the state's reference during its summation to his gang membership, he argues again that review of these claims is warranted under *Golding* as a violation of the constitutional right to a fair trial, or as plain error pursuant to Practice Book § 4185.[10] We are unpersuaded.

The following references to the defendant's involvement in gang activity were made at trial. In recounting the events of August 29, 1992, Sorra testified that when she and the defendant arrived at the Latin Kings party, the defendant sought to speak with the "coronas." Sorra further testified that a "corona" was the person or persons from whom a gang member would receive permission to carry out a mission. Sergeant Christopher Lyons,

---

[10] Practice Book § 4185 (now § 4061) provides in relevant part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

supervisor of the Hartford Police Gang Task Force, testified to the general organizational structure of the Latin Kings. Specifically, he confirmed Sorra's testimony that the "corona" was tantamount to a gang's board of directors, and that gang members were required to seek their permission to carry out any type of illegal activity. Lyons also testified that he knew that the defendant was affiliated with the Latin Kings, primarily because he had seen a large tattoo on the defendant's back indicating his membership in the Latin Kings. When the defendant testified, he voluntarily confirmed that he was a member of the Latin Kings and stated further that he was a "regional commander." In its closing argument, the state asked the jury "to determine that [the defendant's] Latin King pride about being asked to leave the bar . . . caused him to return for retribution, that he intentionally and maliciously killed Fernando Aguiar." In charging the jury, the trial court emphasized that the "testimony about gang membership or another uncharged misconduct by [the defendant] may not be used by [the jury] to infer that if the defendant was a gang member or did an uncharged offense, that, therefore, he must have committed the crimes that are charged. The law forbids such an inference."

The defendant first contends that Sorra's testimony revealing the defendant's gang affiliation and that Lyons' expert testimony indicating that Lyons knew the defendant to be a member of the Latin Kings constituted evidence of uncharged prior misconduct that, once admitted, impermissibly prejudiced the jury against him amounting either to plain error or a deprivation of his constitutional right to a fair trial. We disagree.

It is well settled that evidence of prior misconduct is admissible for the limited purposes of showing intent, an element in the crime, identity, malice, motive or a system of criminal design. *State* v. *Figueroa*, supra, 235

Conn. 162. The challenged testimony established the defendant's association with the Latin Kings, the structural organization of the Latin Kings, and the prevailing ethos of its members. The testimony evinced that the defendant subscribed to that ethos and thus reinforced his motive for killing Fernando Aguiar. Thus, even if we were to characterize the testimony regarding the defendant's gang affiliation as prior misconduct evidence, as the defendant would have us do, we find that the evidence would be properly admissible to establish his motive. It is axiomatic that the probative value of evidence of prior uncharged misconduct must outweigh the prejudicial effect of the other crimes evidence. Id. In the present case, the record supports the conclusion that the prior uncharged misconduct was not only probative but also important for the jury to consider. Further, in light of the fact that the defendant voluntarily testified that he was a ranking member of the Latin Kings, we are not persuaded that the state's evidence concerning the defendant's involvement in gang activity had any prejudicial effect on the outcome of his trial.

" 'Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . .' *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 25, 664 A.2d 719 (1995)." *Santopietro* v. *New Haven*, 239 Conn. 207, 216, 682 A.2d 106 (1996). On the basis of our review of the trial record, we are not persuaded that the trial court's admission of such testimony amounted to any error, let alone plain error. Similarly, we do not find that the defendant's claims concerning the admission of evidence of his involvement in gang activity allege a violation of constitutional magnitude. See *State* v. *Golding*, supra, 213 Conn. 238. Because "it would trivialize the constitution to transmute a nonconstitutional claim into a constitutional

claim simply because of the label placed on it by a party"; *State* v. *Walton*, 227 Conn. 32, 65, 630 A.2d 990 (1993); we conclude as well that *Golding* review of this claim is unwarranted.

The defendant also argues that the state made several prejudicial and inappropriate remarks regarding his affiliation with the Latin Kings during its closing argument, which affected the fundamental fairness of the trial. The defendant concedes that this court " 'will not afford *Golding* review to claims of prosecutorial misconduct where the record does not disclose a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial.' " *State* v. *Williams*, 231 Conn. 235, 246, 645 A.2d 999 (1994). The defendant argues that the state's remarks during its closing argument echoed an impermissible theme throughout the state's case that the defendant's prior misconduct as a member of a gang pointed ineluctably to his likelihood to commit further crimes. A review of the record leads us to conclude, however, that the closing argument did not constitute prosecutorial misconduct depriving the defendant of a constitutional right to a fair trial. The defendant himself stated that he was a member of the Latin Kings, and the prosecutor's allusions to the defendant's Latin Kings membership were limited to establishing his motive for the killing. We conclude, therefore, that the state's comments during its closing argument about the defendant's alleged gang activity did not violate his right to a fair trial, and that the defendant's claim therefore must fail under *Golding*.

V

Finally, the defendant contends that the trial court improperly instructed the jury on the concept of reasonable doubt. The defendant concedes that he did not object at trial to either of the challenged jury instruc-

tions, but he argues that review is proper under *State* v. *Golding*, supra, 213 Conn. 239–40, or as plain error pursuant Practice Book § 4185.[11] We disagree.

Specifically, the defendant challenges the following statements made by the trial court in its charge: (1) "A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts, nor is it a doubt suggested by the ingenuity of counsel or any of the jurors which is not justified by the evidence or by the lack of evidence"; and (2) "[a] reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence." The defendant argues that these instructions on the concept of reasonable doubt reduced the state's burden of proof in violation of his federal and state constitutional rights to due process of law.[12] We agree that the phrase "ingenuity of counsel," taken in isolation, conceivably could misdirect the jury's attention, and we urge trial courts to avoid its further use. As the defendant concedes, however, we have upheld similar language on the ground that these phrases did not, "when properly considered in the broader context of the trial court's instructions in their entirety, [dilute]

---

[11] See footnote 10 of this opinion.

[12] The trial court's full instruction about the concept of reasonable doubt was as follows: "Now, what does that mean, beyond a reasonable doubt. The phrase reasonable doubt has no technical or unusual meaning. We can arrive at the real meaning of the phrase by emphasizing the word reasonable. A reasonable doubt is a doubt which is something more than a guess or surmise. It is not a conjecture or a fanciful doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts, nor is it a doubt suggested by the ingenuity of counsel or any of the jurors which is not justified by the evidence or by the lack of evidence. A reasonable doubt is a doubt based on reason and not on the mere possibility of innocence. It is a doubt for which you can in your own mind conscientiously give a reason. A reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence. It is the kind of doubt which in the serious affairs of everyday life which concerns us all, we would pay heed and attention to. It is the kind of doubt which would make a reasonable person hesitate to act."

the state's burden of proof or otherwise misle[ad] the jury in any way." *State* v. *Cassidy*, 236 Conn. 112, 145, 672 A.2d 899 (1996), cert. denied, U.S. , 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996); see, e.g., *State* v. *Ellis*, 232 Conn. 691, 705, 657 A.2d 1099 (1995); *State* v. *Jeffrey*, 220 Conn. 698, 719, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992); *State* v. *Findlay*, 198 Conn. 328, 346–47, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986); *State* v. *Hansen*, 39 Conn. App. 384, 404, 666 A.2d 421, cert. denied, 235 Conn. 928, 667 A.2d 554 (1995); *State* v. *Lamme*, 19 Conn. App. 594, 607–608, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484 (1990). Because the defendant has failed to demonstrate that the challenged instructions unconstitutionally diluted the burden of proof, he has not demonstrated the existence of an error of constitutional dimension. Similarly, we do not find that the instructions affected the fairness or integrity of the proceedings or resulted in manifest injustice to the defendant. There was no plain error.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and KATZ and PALMER, Js., concurred.

BERDON, J., dissenting. This case raises important issues with respect to the continuing validity, in criminal actions, of allowing the state to argue, and the trial court to instruct the jury, that the jury may draw an adverse inference from the defendant's failure to call a witness pursuant to the rule set forth in *Secondino* v. *New Haven*, 147 Conn. 672, 675, 165 A.2d 598 (1960) (*Secondino* rule).[1] I address two issues: (1) whether,

---

[1] See *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675 ("[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause"). For the purposes of this dissent, the "*Secondino* rule," where the context

on an evidentiary basis, the *Secondino* rule should be abandoned; and (2) whether that rule is constitutional.

I must first point out the importance of the *Secondino* rule in the context of this case. The defendant, Derrick James Taylor, testified at trial that he was with his girlfriend, Michelle Michalski, at a party from 2 a.m. to 4 a.m. during the time of the shooting of the two victims, which occurred at 2:22 a.m. on August 29, 1992. Because the defendant failed to call Michalski as a witness, the state argued and the trial court instructed the jury that, under the *Secondino* rule, the jury could draw an adverse inference from the defendant's failure to call her to corroborate his alibi.

The only person to identify the defendant as one of the perpetrators of the crime was Fitzalbert Williams, a state prisoner who was on a weekend furlough. Williams made an in-court identification of the defendant as the person who shot one of the victims, Fernando Aguiar, notwithstanding the following undisputed facts. Williams made his identification from a third floor apartment window located on the side of a building, the front of which faced the scene of the crime, which was a bar located on the opposite side of New Park Avenue in Hartford. Williams stated that there were two perpetrators of the crime, and that one of them (the shorter of the two) had his face covered, whereas the other, whom he identified as the defendant, did not. Williams made the identification despite the conflicting testimony of sixteen year old Helder Aguiar, the second victim, who testified that both perpetrators had their faces covered. Williams admitted on cross-examination that at the October 5, 1994 probable cause hearing he had testified that he was not certain whether one of the persons he

---

permits, refers not only to the jury instruction on the permissive adverse inference for failure to call a witness, but also to the state's argument to the jury on the adverse inference.

observed on New Park Avenue from his window, which did not face the street, was the defendant. The only other testimony with respect to the identification of the defendant as one of the perpetrators was from Helder Aguiar, who merely testified that the perpetrator who shot him had the same build and wore the same clothing from the waist down as the defendant, observations he made notwithstanding the commotion and fright caused by the shooting.

It is obvious, from the recitation of this identification testimony, that the case against the defendant was paper-thin. Therefore, any adverse inference that the jury was permitted to draw with respect to the defendant's failure to call Michalski as a witness could have had a significant impact on the verdict.

I

First, in my view, the time has come for this court to discard, on an evidentiary basis, the *Secondino* rule at least with respect to criminal cases. I have previously questioned the continuing validity of this rule: "The *Secondino* adverse inference has come under criticism by legal scholars. Professor Colin C. Tait writes: 'The continuing validity of the "missing witness" rule should be called into question. Not only does it consume an undue proportion of the attention of both appellate courts, its underlying premise has been substantially undermined. The rule originated at a time when parties "vouched" for the veracity of their witnesses so that an opponent dared not call an adverse witness. Since a partial witness would be called only by the favored party, that party's failure to call the witness, if available, warranted a negative inference. The voucher rule no longer applies in Connecticut. Under Connecticut's modern rules a party may call an adverse witness, including the opposing party. If an adverse witness is called, the party calling that witness may use leading

questions to interrogate the witness and, if necessary, to impeach the witness. . . .[2] If a witness is available, he is equally available to both sides. If a witness has information favorable to one side, why shouldn't that side call that witness and bring out that information instead of relying on a negative inference based on ignorance that such a witness might have some unspecified information that might be unfavorable to the other party? See *Herbert* v. *Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1046–1048 (5th Cir. 1990). Moreover, the *Secondino* rule is costly. It consumes the time of both the court and the parties, and it incurs expense even for parties who do not wish to call a witness, since they must nevertheless pay to have witnesses available to preclude the assertion of an adverse inference.' C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1994) § 11.5.4, pp. 150–51. Indeed, its misuse in Connecticut is apparent and could have life and death consequences. *State* v. *Ross*, 230 Conn. 183, 324–34, 646 A.2d 1318 (1994) (*Berdon, J.*, dissenting) (majority suggested that state is entitled to *Secondino* adverse inference jury instruction for failure to call psychiatric witness whom defense consulted in capital murder trial notwithstanding attorney-client privilege)." *Tianti* v. *William Raveis Real Estate, Inc.*, 231 Conn. 690, 706 n.1, 651 A.2d 1286 (1995) (*Berdon, J.*, concurring and dissenting); see also *Hines* v. *St. Vincent's Medical Center*, 232 Conn. 632, 638 n.9, 657 A.2d 578 (1995). Furthermore, Justice Palmer expressed similar concerns in *Hines*. See *Hines* v. *St.*

---

[2] Professor Tait also points out the following with respect to civil cases: "In addition, Connecticut permits widespread discovery so that all parties know, and may depose, all relevant witnesses before trial. Thus, each party should in fact know which witnesses are favorable to which side. That being so, why should a party not be required to call any witness favorable to his cause?" C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1994) § 11.5.4, p. 151. Although I have indicated that even in a civil case the trial court should not instruct the jury that it may draw an adverse inference for failure to call a witness, I would leave for another day whether that prohibition should be extended to summation arguments before a civil jury.

*Vincent's Medical Center*, supra, 644–45 (*Palmer, J.*, concurring).

The majority refuses to reexamine the *Secondino* rule, claiming it was not raised before the trial court and, because it is merely an evidentiary matter, *Golding* review[3] is not appropriate. I disagree in both instances.[4]

[3] *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see footnote 5.

[4] Regardless of the question of whether the *Secondino* rule should be abandoned, this case vividly points out that the rule that the instruction is applicable even when the witness is equally available to both parties is wrong.

In this case, Michalski had given the police a statement favorable to the state, in which she stated: "We got to the Latin Kings party about 8:30 p.m. . . . I was dancing with the girls and moving around so [the defendant] might have gone out without my noticing " In fact, not only was Michalski listed as a state's witness and under the state's subpoena to testify, she was actually present in the courtroom during the trial. Nevertheless, the state decided not to call Michalski. In this respect, the following colloquy took place between the state's attorney and the trial judge:

"The Court: . . . Now, you did not wish to call Ms. Michalski?

"[State's Attorney]: Yes, Your Honor. I made the determination without ever having spoken to her that based upon the statement that I had, the other material—that statement being I guess capable of various determination because she does say in there that it could—because she was dancing with girls at the party, it could be that the defendant could have left without her knowing it, but she doesn't give a time frame on that, and so that based upon that, and the fact that she had come with—been brought by the defendant's father, so that I think—and I think I may have alluded to that, at least by intonation in my comment before—I can't find that she is someone that I would trust in order to call as a witness myself, so I made that decision not to."

In dictum, *we* have stated that even when the witness is equally available to both parties, the *Secondino* instruction is proper as long as the requirements are satisfied. *Hines* v. *St. Vincent's Medical Center*, supra, 232 Conn. 637 n.8; see also id., 640–44 (*Borden, J.*, concurring); id., 644 (*Palmer, J.*, concurring). I now specifically disavow that dicta. In cases in which a witness is equally available to both parties, there is no logical basis for allowing an inference to be drawn from one party's failure to call that witness when the other party could have just as easily called that same witness. This is especially so because we have abandoned the voucher rule—that is, the common law rule that one could not impeach the credibility of his own witness. See *State* v. *Graham*, 200 Conn. 9, 17, 509 A.2d 493 (1986).

In fact, for this very reason, other jurisdictions have prohibited drawing an inference from the failure to call a witness equally available to both

The continuing validity of the *Secondino* rule was clearly raised at the very time the state requested permission to argue and for the trial court to instruct the jury on the adverse inference. The issue was raised and dismissed by the trial judge as follows:

"The Court: . . . Of course, the law as to *Secondino* instructions—we most recently had a case two weeks ago, *Hines* v. *St. Vincent's Medical Center*, [supra, 232 Conn. 644] where Justice Palmer has opined we ought to dump the rule. I believe there was a case a few months ago where Justice Berdon, who wrote the majority in *Hines*, but indicated since the issue had not been briefed, this was not the case in which to discuss the continued vitality of the *Secondino* rule, but I think he dissented in the case a few months ago suggesting that *Secondino* should be abandoned.

"[State's Attorney]: I didn't read that case. I did read *Hines* v. *St. Vincent's Medical Center*, [supra, 232 Conn.

parties. See, e.g., *United States* v. *Anchondo-Sandoval*, 910 F.2d 1234, 1238 (5th Cir. 1990) ("[t]he well-settled rule in this Circuit is that drawing any inference from a party's failure to call a witness equally available to both sides is impermissible"); *Bethune* v. *State*, 542 So. 2d 332, 334 (Ala. Crim. App. 1989) (" '[i]t is the settled law in this state that no unfavorable inference can be drawn, and no unfavorable argument to a jury made, by counsel against a party to a cause because of the failure to call a witness to testify, when that witness is accessible to both parties, and can be introduced by and examined by either party' "); *State* v. *Chunn*, 784 S.W.2d 228, 230 (Mo. App. 1989) ("[i]t is impermissible to draw an adverse inference if the missing witness is equally available to both parties"); *State* v. *Ramos*, 121 N.H. 863, 869, 435 A.2d 1122 (1981) (holding missing witness instruction inapplicable "where the witness is equally available [or unavailable] to both sides"); see also *United States* v. *Cook*, 771 F.2d 378, 383 (8th Cir. 1985) ("such a presumption is to be cautiously applied and where the witness was apparently available to both parties, [we seriously doubt whether] any presumption should flow from the failure of either party to call such witness" [citation omitted; internal quotation marks omitted]). Indeed, more than twenty years ago this court was correct when it held that a defendant was not entitled to an adverse inference instruction when a witness was available to both parties. See *State* v. *Brown*, 169 Conn. 692, 705, 364 A.2d 186 (1975) ("[w]hen a witness is equally available to both parties no inference unfavorable to either may be drawn").

632] that Your Honor was kind enough to give to both of us. . . .

"The Court: Yes, but I perceive it to be my responsibility to follow the law as expressed by the Supreme Court, whether or not that law may be on the list of possible laws to be changed or possible rules to be changed. Now, you did not wish to call Ms. Michalski?"

The trial court made a definitive ruling that it was bound by the *Secondino* rule until such time as this court changed it, and that, under the existing rule, this was an appropriate case to allow the state to argue an adverse inference against the defendant for failure to call Michalski as a witness and to instruct the jury on the rule. Indeed, nothing else could have been expected of the attorney for the defendant other than taking a formal exception to the trial court's ruling. We, however, did away with this archaic rule. See C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1996) § 3.5.9, p. 47. Furthermore, argument with respect to the trial court's ruling would have been improper. See Practice Book § 850A ("[a]rgument upon such objection or upon any interlocutory question arising during the trial of a case shall not be made by either party unless the court requests it"). Basic fairness, especially under the circumstances of this case, requires the court to review the issue.

## II

Even if the defendant failed to object properly to the state's missing witness argument and the trial court's instruction on the *Secondino* rule, the issue is reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989),[5] because both the argument and the instruc-

---

[5] Under *State* v. *Golding,* supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the

tion in a criminal case violate the defendant's federal constitutional right of due process. I recognize that this court has summarily ruled in the past that the "giving of a *Secondino* charge is purely an evidentiary issue and is not a matter of constitutional dimensions." *State* v. *Anderson*, 212 Conn. 31, 41–42, 561 A.2d 897 (1989). In my view, however, those cases were wrongly decided on that issue.

"It is fundamental that any person accused of a crime is presumed innocent unless and until the state has proven his guilt by establishing each essential element of the crime charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Nelson*, 17 Conn. App. 556, 561, 555 A.2d 426 (1989)." *State* v. *Lopez*, 38 Conn. App. 434, 444, 662 A.2d 792 (1995), remanded for further proceedings, 239 Conn. 56, 681 A.2d 950 (1996). The reasonable doubt standard "provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' " *In re Winship*, supra, 363. The requirement of proof beyond a reasonable doubt " 'protects the fundamental value determination of our society, given voice in Justice Harlan's concurrence in *Winship*, that it is far worse to convict an innocent man than to let a guilty man go free.' " *State* v. *Gerardi*, 237 Conn. 348, 356, 677 A.2d 937 (1996).

Furthermore, it is well established that "[a]n instruction that dilutes the state's burden, or places a burden on the defendant to prove his innocence, is unconstitutional. *Sandstrom* v. *Montana*, 442 U.S. 510, 99 S. Ct.

violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

2450, 61 L. Ed. 2d 39 (1979)." *State* v. *Reddick*, 197 Conn. 115, 131–32, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). In my view, the *Secondino* rule unconstitutionally diminishes the state's burden of proving the defendant's guilt beyond a reasonable doubt. It is incomprehensible to me that, although the defendant bears no burden and need not present evidence or call witnesses, it is permissible for the trial judge to instruct the jury, or for the state to comment, that the jury may draw an unfavorable inference on the defendant's failure to produce a witness.

Other jurisdictions have come to the conclusion that it is constitutionally impermissible in criminal cases to draw an adverse inference from a defendant's failure to call a witness. See *State* v. *Brewer*, 505 A.2d 774, 777 (Me. 1985) ("To allow the missing-witness inference in a criminal case is particularly inappropriate since it distorts the allocation of the burden of proving the defendant's guilt. The defendant is not obligated to present evidence on his own behalf. The inference may have the effect of requiring the defendant to produce evidence to rebut the inference. If he fails to do so, the missing-witness inference allows the state to create 'evidence' from the defendant's failure to produce evidence. Such a result is impermissible."); *State* v. *Caron*, 300 Minn. 123, 127, 218 N.W.2d 197 (1974) (per curiam) ("such comment might suggest to the jury that defendant has some duty to produce witnesses or that he bears some burden of proof"); *Ross* v. *State*, 106 Nev. 924, 927, 803 P.2d 1104 (1990) ("[Missing witness argument] can be viewed as impermissibly shifting the burden of proof to the defense. . . . Such shifting is improper because it suggests to the jury that it was the defendant's burden to produce proof by explaining the absence of witnesses or evidence." [Citation omitted; internal quotation marks omitted.]); *State* v. *Leyba*, 89 N.M. 28,

29, 546 P.2d 876 (1976) (concluding that prosecutor's remarks with respect to missing witness inference "suggest that a defendant has some duty to produce witnesses or has some burden of proof"); *State* v. *Jefferson*, 116 R.I. 124, 139–40, 353 A.2d 190 (1976) ("[w]e now believe that the Minnesota court's concern about the jury's possible mistaken belief that a defendant has a duty to prove his innocence is well taken"); *State* v. *Posey*, 269 S.C. 500, 503, 238 S.E.2d 176 (1977) ("An accused has the right to rely entirely upon [the] presumption of innocence and the weakness in the State's case against him. He would clearly be deprived of that right if an adverse inference is permitted to be indulged against him because of its exercise."); *Russell* v. *Commonwealth*, 216 Va. 833, 837, 223 S.E.2d 877 (1976) ("[Missing witness instructions] would run head on into the presumption of innocence to which every accused is entitled and upon which juries are universally instructed. The burden is upon the prosecution to prove its case against the accused. The defense need not prove anything; it may rely upon the presumption of the innocence. To tell a jury that the failure of the defense to call a material witness raises an adverse presumption against the accused is to weaken, if not neutralize, the presumption of innocence which, if given its full strength, might be sufficient to tip the scales in favor of acquittal."); see also *Commonwealth* v. *Schatvet*, 23 Mass. App. 130, 135, 499 N.E.2d 1208 (1986) ("[c]ircumspection . . . is especially called for where the inference would run against a defendant in a criminal prosecution, for the inference may come uncomfortably close to invading constitutional rights"). Indeed, the Fifth Circuit Court of Appeals pointed out that "we do not approve of comments reflecting on the lack of evidence presented by a defendant in a criminal case . . . . Such a course of action by the prosecutor is a parlous one at best, of necessity sailing close to implying

that the defendant is obligated to produce evidence of his innocence." *United States* v. *Iredia*, 866 F.2d 114, 118 (5th Cir.), cert. denied, 492 U.S. 921, 109 S. Ct. 3250, 106 L. Ed. 2d 596 (1989).

I would hold that the state is not permitted to argue to the jury that it may draw an adverse inference from the defendant's failure to call a witness or to produce evidence, nor may the trial court instruct the jury that it may draw such an inference, whether construed as raising evidentiary or constitutional concerns. In short, for at least criminal matters, we should abandon the *Secondino* rule. I would, therefore, reverse the conviction and remand this case for a new trial.

Accordingly, I respectfully dissent.