******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., concurring in part and dissenting in part. I agree with parts I and II of the majority opinion. Specifically, I agree with the majority that the Appellate Court incorrectly construed the third prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), to require an appellant to produce binding precedent directly on point in order to establish that "the alleged constitutional violation clearly exists and clearly deprived the [respondent] of a fair trial" in order to prevail under *Golding*. I also agree with the majority that the respondent mother, Ashley P. (respondent), has not demonstrated that her right to due process was violated by the trial court's failure to personally canvass her regarding her decision to allow the court to decide whether to grant the petition[1] of the petitioner, the Commissioner of Children and Families, to terminate the parental rights of the respondent on the basis of the documentary evidence submitted by the petitioner, without the presentation of testimony.

I write separately, however, to express my disagreement with the majority's determination, in part III of its opinion, to invoke this court's supervisory authority to reverse the judgment of the Appellate Court in the present case in accordance with the new rule announced in its decision, which requires the trial court to personally canvass a parent who is represented by counsel before accepting a waiver of the right to a full trial and a decision not to contest the exhibits offered by the Department of Children and Families (department) in support of a petition to terminate parental rights. Today's decision exemplifies the routine manner in which this court invokes its supervisory authority of late. Certainly, the issue at stake is an important one—ensuring that a parent's waiver of the right to trial and to contest the department's evidence in a termination proceeding is knowing, intelligent and voluntary. The majority has not persuasively explained, however, why representation by counsel is not sufficient to ensure that a parent's waiver comports with the requirements of due process. The majority, therefore, has not demonstrated how its rule is required for the administration of justice. Nor has the majority offered any explanation as to why it believes this case presents the type of extraordinary circumstance that justifies the invocation of this court's supervisory authority in order to reverse the judgment of the Appellate Court. My review of the record reveals that there was no question that the respondent, who was represented by counsel and who previously had her rights terminated with respect to three of her other children, was quite familiar with the consequences of the termination of her parental rights. There is no indication in the record that counsel was experiencing any difficulty communicating with the

respondent or that the respondent had taken issue with the strategic decisions of counsel at any point during these protracted proceedings. Nor has the respondent alleged that her counsel's performance was deficient. Indeed, the record provides support for the conclusion that the respondent's counsel was justified in resting on the papers, given the overwhelming, negative testimony about the respondent that would have been presented had this case gone to trial. By invoking its supervisory authority, therefore, the majority second-guesses the strategy choices of counsel and forces the children who are the subject of the petition to suffer additional, needless delay before being placed permanently. Accordingly, I respectfully dissent with respect to part III of the majority opinion.

I have said it before—this court exercises its supervisory authority "too broadly, too readily and too often." *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 457, 112 A.3d 1 (2015) (*Espinosa, J.*, dissenting). In light of recent decisions expanding the scope of that authority; see id., 268–72; *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 144–66, 84 A.3d 840 (2014); as well as the court's increasingly routine reliance on what is supposed to be an extraordinary power, I believe that it is time to take stock and consider the ramifications of the court's existing jurisprudence on the scope of that authority. Because that power is now entrenched in our jurisprudence, I do not believe that it is possible to abandon it, but it is time that we take seriously the oft recited mantra that this court's supervisory power should be exercised rarely. See, e.g., *State* v. *Edwards*, 314 Conn. 465, 498, 102 A.3d 52 (2014); *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998).

Three decades—that is the extent of this court's history of reliance on its inherent supervisory authority. Thirty years, out of the almost 230 year history of this court's published opinions. I believe that it is fair to say that the supervisory authority of this court is a relatively new power. In light of its brief history, it is perhaps not surprising that we have not yet considered the ramifications of how we have used the power thus far. This court's recent decisions, however, make it very clear that the time has come to have that discussion. See, e.g., *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 268–72; *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 144–66. In order to better understand the nature of our supervisory power and the need to exercise it with "great caution"; *State* v. *Santiago*, 245 Conn. 301, 343, 715 A.2d 1 (1998) (*Callahan, C. J.*, concurring and dissenting); I begin by reviewing the origins of our reliance on it, trace the path of that power to its present day form, and, finally, explain why the present case is not an appropriate one for the exercise of that authority.

Preliminarily, I offer the following observation. Unrestrained exercise of this court's supervisory authority is dangerous because it erodes the predictability that is essential to the rule of law. The best perspective from which to understand the danger is from the vantage point of the litigants who appear before this court. Massachusetts Supreme Judicial Court Justice Oliver Wendell Holmes, later a justice of the United States Supreme Court, expressed it aptly: "When we study law we are not studying a mystery but a well known profession. We are studying what we shall want in order to appear before judges, or to advise people in such a way as to keep them out of court. The reason why it is a profession, why people will pay lawyers to argue for them or to advise them, is that in societies like ours the command of the public force is intrusted to the judges in certain cases, and the whole power of the state will be put forth, if necessary, to carry out their judgments and decrees. People want to know under what circumstances and how far they will run the risk of coming against what is so much stronger than themselves, and hence it becomes a business to find out when this danger is to be feared. The object of our study, then, is prediction, the prediction of the incidence of the public force through the instrumentality of the courts." O. Holmes, "The Path of the Law," 10 Harv. L. Rev. 457 (1897).

Justice Holmes' remarks clarify that predictability is not an abstract value, revered in a vacuum by the proponents of judicial restraint. It is a value that has pragmatic worth, because predictability ensures that the law *works* for those who need it. The parties who argue before this court through their attorneys are entitled to rely on the predictability of the rule of law. They come before the court with the expectation that the existing precedents will determine the resolution of the appeal, and they make their decisions and prepare their cases on the basis of that expectation. When this court decides appeals more and more frequently on the basis of supervisory authority, however, we add a level of mystery to the law that defeats expectation. No one wants to pay an attorney to speculate as to whether this court will decide to invoke its supervisory authority. And no attorney wants to be placed in the position of trying to guess whether his or her appeal will be the next instance in which the court exercises that authority rather than resting the decision on the merits. Reserving our supervisory authority for the very rare instances when it is appropriate, by exercising self-restraint, and adhering consistently to guidelines for its exercise will protect the predictability that is essential to the rule of law.

I

HISTORY OF THIS COURT'S EXERCISE OF
SUPERVISORY AUTHORITY

## A
### Origin of the Authority

The origin of this court's supervisory authority tells the entire story—our power is self-conferred, unanchored, and, unless we ourselves restrain it, unlimited. This court first invoked its inherent supervisory authority in 1983, in *State* v. *Ubaldi*, 190 Conn. 559, 569–75, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), in which the court reversed the defendant's conviction on the basis of prosecutorial impropriety. The defendant in *Ubaldi* had been convicted of various counts of larceny in connection with the conversion of tax funds that he had collected on behalf of the city of Waterbury. Id., 560. During cross-examination of the defendant, the prosecutor asked whether a certain person, Nick Jamele, to whom the defendant apparently had disbursed city funds, was the defendant's " 'bookie . . . .' " Id., 561. The court sustained the defendant's objection to the question and instructed the jury to disregard it. Id., 561–62 n.2. The state subsequently attempted to call Jamele as a witness. Id., 564. During the state's proffer to the court outside the presence of the jury, however, Jamele successfully invoked his fifth amendment privilege against self-incrimination. Id. Notwithstanding both Jamele's unavailability as a witness and the trial court's earlier ruling that had barred the state from implying an unsavory connection between the defendant and Jamele, the prosecutor commented during closing argument on the defendant's failure to call Jamele as a witness, thus reviving the court prohibited suggestion that the defendant had paid off gambling debts to Jamele with city funds. Id.

This court characterized the prosecutor's conduct as deliberate, and undertaken in "total disregard" of the intent of the trial court's rulings, which was to protect the defendant "against consideration by the jury of irrelevant and prejudicial matters." Id., 567. The court's ability to deter such conduct, the court explained, is essential to " 'the integrity of the judicial system.' " Id., 572. Accordingly, the court rejected the state's claim that it should prevail on appeal because the defendant had not been deprived of a fair trial by the improper remarks, and announced that "[a]n appellate court has a certain inherent supervisory authority over the administration of justice . . . in the trial courts below that permits action to deter prosecutorial misconduct which is unduly offensive to the maintenance of a sound judicial process." (Citation omitted; internal quotation marks omitted.) Id., 570. Because of the flagrant nature of the impropriety, the court reasoned, a mere rebuke without the concrete sanction of reversal would not deter counsel from repeating the offense. "Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a

ritualistic verbal spanking." (Internal quotation marks omitted.) Id., 571. Thus, because the conduct at issue would not constitutionally mandate a new trial, the court viewed its reliance on its supervisory authority as *necessary* under the extraordinary circumstances of the case. Id., 571–72.

Significantly, the court in *Ubaldi* established several prerequisites that justified the use of its new power. As I have already indicated, the court viewed its resort to the power to be driven by necessity. The court understood the case to implicate an important issue, nothing less than the integrity of the judicial system itself. Id., 568. In addition, the court emphasized that the case presented extraordinary circumstances that justified the invocation of its supervisory authority. The prosecutor's behavior was extreme—the court stressed the flagrant and deliberate nature of the impropriety; id., 571; which "undermine[d] the authority of the trial court's ruling . . . ." Id., 574. And the circumstances of the case were sui generis, prompting the court to observe that it had never been presented with "a situation precisely like the one before us." Id., 566. The court also recognized that its new authority "must not be undertaken without balancing other interests which may be involved." Id., 572. For instance, "[t]he trauma which the victim of a heinous crime might undergo by being forced to relive a harrowing experience or the practical problems to be encountered in retrying a case several years after the event require a cautious approach." Id. Because, however, there were no "highly significant competing social interests [to] outweigh the important judicial consideration of restraining serious prosecutorial misconduct," the court deemed it an appropriate circumstance in which to exercise its supervisory authority. Id., 573.

The court made clear, therefore, that it viewed its new supervisory authority as a power only to be used in limited, exceptional circumstances, invoked only when its exercise is necessary and the interests involved are of the utmost importance, and when an evaluation of the interests involved reveals that the balance weighs in favor of invoking the authority. Applied properly, these considerations should yield the result that our supervisory power is reserved for the *rare* instance in which this court's reliance on it is appropriate.[2]

The court looked to federal authority to justify its claim to this new power. Given the "inherent" nature of the supervisory power, one would expect the federal decisions on which the court in *Ubaldi* relied to stem from some incipient authority—constitutional provisions, a very early decision of the United States Supreme Court, colonial law, or perhaps even English common law. Such expectations are doomed to disappoint. "Inherent" supervisory authority is a twentieth century concept. A. Barrett, "The Supervisory Power

of the Supreme Court," 106 Colum. L. Rev. 324, 387 (2006). Like the court in *Ubaldi*, when the United States Supreme Court first invoked its supervisory power in *McNabb* v. *United States*, 318 U.S. 332, 340, 63 S. Ct. 608, 87 L. Ed. 819 (1943), the court did so in response to governmental misconduct. Specifically, the facts of *McNabb* suggested that the petitioners had been held without bail and questioned for two days by law enforcement officials, without having been brought before a United States commissioner or a judge. Id., 334–38. In analyzing the petitioners' claim that the foregoing facts warranted reversal of their convictions, the court eschewed any discussion of constitutional issues, deeming such discussion "unnecessary." Id., 340. Instead, the court announced that "[j]udicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." Id. The court claimed in *McNabb* that it had been exercising this authority all along, on the basis that "this [c]ourt has, from the very beginning of its history, formulated rules of evidence to be applied in federal criminal prosecutions." Id., 341.

None of the authorities cited by *McNabb*, however, purported to invoke the court's supervisory authority, nor did they provide support, either for the proposition that the court has the authority to engage in rule making by way of adjudication, or, as happened in *McNabb*, to apply a new rule to the case at hand. Instead, the cases cited in *McNabb* merely applied established legal principles to the facts of the particular case in order to determine the proper evidentiary rule. See, e.g., *United States* v. *Gooding*, 25 U.S. (12 Wheat.) 460, 469, 6 L. Ed. 693 (1827) (The court rejected the defendant's claim that the witness' testimony regarding certain admissions made by the defendant's agent was inadmissible, on the basis that "[i]n general the rules of evidence in criminal and civil cases are the same. Whatever the agent does, within the scope of his authority, binds his principal, and is deemed his act."); *United States* v. *Furlong*, 18 U.S. (5 Wheat.) 184, 199, 5 L. Ed. 64 (1820) (rejecting proposition that only admissible testimony as to character of ships plundered by pirates was limited to documentary papers, and citing to various legal principles in support of conclusion, including fact that laws requiring such papers to be on vessels are not for purposes of criminal prosecution, but, rather, purposes of finance and commerce); see also S. Beale, "Reconsidering Supervisory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the Federal Courts," 84 Colum. L. Rev. 1433, 1435 (1984) ("*McNabb* represented a substantial departure from the role played by the [United States] Supreme Court during the first 140 years of its existence. The [c]ourt's assertion of supervisory authority rested on the assumptions that the federal courts would follow federal procedure

and that the [c]ourt was the appropriate body to exercise overall responsibility for developing and supervising the implementation of this procedure, particularly in criminal cases. Prior to 1930 neither of these assumptions was valid.").[3]

Nor did the court in *McNabb* offer any constitutional or statutory authority to justify its claim to supervisory authority.[4] The power, therefore, is untethered to any external authority. The trail of its common-law roots ends with *McNabb*, and it is not derived from any legislative or constitutional grant of power, but rather is a power that the court conferred upon itself.

In *Ubaldi*, therefore, this court moored itself to a ship that had no anchor. Our supervisory authority is inherent only in the sense that it is a power that we ourselves created by stating that we have it. Its strength and authenticity stem only from the confidence with which we assert that we are entitled to use it. This recognition is critical toward understanding why we must exercise that power with great caution. I previously have observed that when this court exercises its supervisory authority, "our use of it is virtually unreviewable . . . ." *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 455–56 (*Espinosa, J.*, dissenting). The origin of our authority, which reveals that the power is a self-proclaimed one, explains why our use of the power is virtually unreviewable and can only be limited by this court. Only by doing so can we protect the predictability of the rule of law. We often have stated that our supervisory authority is not "a form of free-floating justice, untethered to legal principle . . . ." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 768, 91 A.3d 862 (2014), quoting *State* v. *Pouncey*, 241 Conn. 802, 813, 699 A.2d 901 (1997). That statement is only true as long as we hold ourselves to it. And we have not been doing that.

B

Evolution of the Doctrine

A review of the history of this court's reliance on its supervisory authority since *Ubaldi* reveals a gradual and steady increase in reliance on the authority for the first twenty-five years, then a sharp spike in the past five years, both in the frequency with which the court invokes the power and the breadth of its application. As an overview, since and including *Ubaldi*, this court has invoked its supervisory authority approximately forty-four times.[5] In the 1980s, the court relied on its supervisory authority only four times.[6] Between 1990 and 1999, the court used its supervisory power fourteen times;[7] between 2000 and 2009, the court invoked its power twelve times.[8] Astonishingly, in the past five years, the court already has relied on its supervisory authority, including the exercise by the majority in the present case, fourteen times, and we are not quite half-

way through the decade.[9] To put that number in perspective, approximately one third of this court's decisions invoking supervisory authority have been issued within the past five years.

Although the drastically increased frequency of this court's reliance on supervisory authority suggests that there may be a problem, the numbers alone are not conclusive. For instance, it could be possible that within the past five years there simply have been many more extraordinary circumstances that have justified a more frequent invocation of our supervisory power. On the other hand, perhaps the court's decisions initially adhered to the limitations set forth in *Ubaldi*, and then gradually abandoned those limits. Although it may be argued that the latter is somewhat closer to the truth, it does not give a complete picture of the problem, which is a complex one. This court's supervisory decisions have never treated the limitations set forth in *Ubaldi* as binding in any sense of the word—from the beginning, we have sometimes adhered to those limits, but in the majority of cases, we have not given any indication that we have even *considered* them prior to invoking our authority.

Two principles might explain both the inconsistency in this court's consideration of the limits on its supervisory authority, as well as the substantial, recent increase in the exercise of that authority. First, and most fundamentally, despite the oft repeated refrain that this court's supervisory power is not a form of "free-floating justice"; *State* v. *Santiago*, supra, 245 Conn. 333; it is the inherent nature of a self-conferred power that it lacks limits unless those are self-imposed. Second, after the court announced the existence of its supervisory authority in 1983, the court seems simply to have assumed its validity and has not given significant consideration to establishing and adhering to any parameters for its exercise. With the passing of time, absent any consistent adherence to self-imposed limitations on the power, the court has become less and less capable of disciplining itself to view its supervisory authority as extraordinary. The court has become habituated to its use, and now treats its supervisory power as a panacea for any difficult problem confronting it.

It is neither possible, nor helpful, to discuss all forty-four decisions in illustrating the course that our law on supervisory authority has taken over the past thirty years. I restrict my discussion to some of the earlier decisions, general remarks regarding trends in the intervening years, and a closer look at a few recent decisions. I also have limited my discussion to the two types of exercise of supervisory authority that are at issue in the present case: applying a newly announced rule to reverse the judgment that is the subject of the appeal; and announcing a new rule with prospective application. See *State* v. *Elson*, supra, 311 Conn. 768–71

n.30 (collecting cases).[10] I first consider the evolution of our supervisory power in cases in which we have applied a new rule to the pending appeal, then turn to decisions that have announced a new rule that is to be applied prospectively. I conclude that both lines of cases demonstrate a lack of focus on the importance of self-restraint in invoking our supervisory powers.

After *Ubaldi*, the court did not rely on its supervisory authority to reverse the judgment at issue in an appeal for twelve years. Viewed in context, *State* v. *Jones*, 234 Conn. 324, 662 A.2d 1199 (1995), represented a modest exercise of the court's supervisory authority, and appears to have been mindful of the guidelines that the court established in *Ubaldi*. The court resolved the appeal on the merits, applying the laws of severance and joinder, together with principles of statutory construction, to hold that, when a defendant is charged with capital felony in violation of General Statutes (Rev. to 1995) § 53a-54b (3), he is entitled to be tried in a bifurcated proceeding. Id., 343–44. The standard of review of the trial court's denial of the defendant's motion to bifurcate was whether the trial court abused its discretion and the court was loath to reverse the judgment on the merits. Id., 343. The court explained: "We do not demand or necessarily expect our trial courts to create new roads of practice and procedure never before traveled in our jurisdiction." Id., 346. Accordingly, the court relied on its supervisory authority to reverse the judgment. Id., 346–47. A reasonable way to read *Jones* is that the court viewed the exercise of supervisory authority as necessary because the alternative would have been absurd—to hold that the trial court abused its discretion by failing to adhere to a rule that had not yet been articulated by this court. In addition to finding necessity, the court also relied on extraordinary circumstances presented in *Jones*, citing to the "high risk of prejudice to the defendant on the present record . . . ." Id., 346. The court also considered the countervailing interests, concluding that the high risk of prejudice, at least in *Jones*, outweighed the state's interest in judicial economy. Id.

The court's very next exercise of its supervisory authority in which it applied a new rule to a pending appeal, however, evidenced none of the restraint shown in *Jones*. In *State* v. *Coleman*, 242 Conn. 523, 700 A.2d 14 (1997), not only did the court fail to offer any explanation as to why it was appropriate to resolve the case on its supervisory authority, the court expressly stated that it did not need to resolve the state constitutional issue raised by the defendant because the issue could be resolved by invoking the court's supervisory authority. Id., 534. *Coleman*, accordingly, presented a radical departure from the principles espoused in *Ubaldi* and adhered to carefully in *Jones*—without even indicating any awareness that the court was departing from anything at all. What makes the majority's exercise of the

court's supervisory power even more astonishing is that the concurrence in *Coleman* expressly stated that the court's supervisory authority should be reserved "for addressing serious concerns that affect the integrity of the defendant's trial in particular and the perceived fairness of the judicial system as a whole." Id., 550 (*Norcott, J.*, concurring).

Subsequent decisions applying new rules to pending appeals pursuant to our supervisory authority have seemed to follow *Coleman* more than *Ubaldi* and *Jones*. One example is *State* v. *Santiago*, supra, 245 Conn. 331–32, in which the court concluded that the trial court did not abuse its discretion in finding that allegations of a juror's racial bias lacked credibility, following a preliminary inquiry into the allegations as required by *State* v. *Brown*, 235 Conn. 502, 530–31, 668 A.2d 1288 (1995). Notwithstanding that conclusion, the court relied on its supervisory authority to reverse the judgment of the trial court, and to announce a rule requiring that, when there have been allegations that a juror has made racial epithets, the trial court must conduct a more extensive inquiry than required by *State* v. *Brown*, supra, 530–31. *State* v. *Santiago*, supra, 340.

Although the court properly placed great emphasis on the importance of the issue implicated by the appeal, the court did not claim, and indeed it could not, that extraordinary circumstances justified reversal. The trial court expressly had found that the witness who had alleged the misconduct was biased—prior to making her allegations, she had sent the court a letter indicating that she regretted her vote to convict the defendant and questioned his guilt, and also opined that, even if he was guilty, his act of killing a drug dealer had saved many from " 'the heartbreak of drug abuse . . . .' " Id., 324 n.14. There were also serious inconsistencies in her allegations, and when questioned by the trial court during the *Brown* inquiry, she was not able to offer any explanation for those inconsistencies. Id., 326–27 n.16. By apparently second-guessing the trial court's credibility finding, the majority in *Santiago* seemingly usurped the properly exercised discretion of the court and substituted its own judgment. The concurring and dissenting opinion accurately characterized the court's exercise of supervisory authority in the case to be irreconcilable with the "long settled distinction between the unique roles of appellate and trial courts." Id., 342 (*Callahan, C. J.*, concurring in part and dissenting in part).

Another, more recent example follows the *Coleman* model quite closely. In *State* v. *Polanco*, 308 Conn. 242, 248, 61 A.3d 1084 (2013), the court stated that it did not need to reach the constitutional claim because the appeal could be resolved by invoking the court's supervisory authority. What is particularly troubling about the exercise of supervisory authority in *Polanco* is the

suggestion by the court that it was not resolving the claim on the constitutional issue raised by the defendant because doing so would have been difficult. Specifically, in justifying its reliance on its supervisory authority, the court stated: "We find *Rutledge* [v. *United States*, 517 U.S. 292, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996)] to be less than a model of clarity as to what extent its holding was constitutionally based rather than jurisprudentially based or a matter of statutory construction." *State* v. *Polanco*, supra, 256. A fair reading of *Polanco* is that the court exercised its supervisory authority in order to avoid deciding a tricky issue.

The last case that I discuss in this part is *State* v. *Elson*, supra, 311 Conn. 726. I recognize that I participated in the panel in *Elson*, and I joined the unanimous decision. I have reconsidered, and now believe that the court improperly exercised its supervisory authority in that case to reverse the judgment of the Appellate Court with respect to the defendant's sentencing. In doing so, this court substituted its judgment for the properly exercised discretion of the trial court. *Elson* involved the trial court's remarks, during the defendant's sentencing hearing, that: "We've all heard the defendant's apology. I don't know how sincere it is, but it is certainly unfortunate that it comes so late in the process. If the defendant had been truly apologetic, he wouldn't have put the victim through the trial. To a large extent, it seems to me that the defendant's apology represents thinking of himself rather than the victim." (Emphasis omitted; internal quotation marks omitted.) Id., 733. The court in *Elson* concluded that the defendant had failed to demonstrate that, viewed in the totality of the circumstances, the trial judge's remark demonstrated that the judge had augmented the defendant's sentence in retaliation for the exercise of his right to trial. Id., 762. The record demonstrated that the trial court considered many factors in sentencing the defendant, including the severity of the assault that gave rise to the defendant's conviction, the probation report's recommendation of a lengthy term of incarceration, the defendant's lack of truthfulness, and the fact that the attack was part of a pattern of behavior that justified the court's conclusion that the defendant was a dangerous person from whom the victim and society deserved protection. Id., 761–62.

Despite acknowledging all of this, and also concluding that the trial court considered the defendant's expression of remorse relevant only to whether the defendant was entitled to leniency; id., 762; the court in *Elson* issued a prophylactic rule precluding trial courts from commenting negatively on the defendant's election to proceed to trial during sentencing; id., 777; and remanded the case for a new sentencing hearing, concluding that the trial court's remarks "created an appearance of impropriety . . . ." Id., 784. Certainly, if one ignored the context of the remarks, and evaluated them in isolation, the remarks might have that effect.

But we have specifically rejected a test that would evaluate a trial court's sentencing remarks in isolation, instead adopting the totality of the circumstances test. *State* v. *Kelly*, 256 Conn. 23, 82–83, 770 A.2d 908 (2001). Viewed in the totality of the circumstances, therefore, the remarks do not create the appearance of impropriety at all. One is left with the impression that the court in *Elson* was motivated to use its supervisory authority to accomplish what the law precluded, merely because the trial court's awkwardly worded comment, if viewed in isolation, could be misconstrued to mean that the court was penalizing the defendant for exercising his right to a jury trial. It is difficult to see how the theoretical possibility that a trial judge's sentencing remarks, if construed in a manner that is expressly prohibited by our law, could give rise to the conclusion that the court violated a defendant's rights, justifies the invocation of this court's supervisory authority.

The progression in our decisions that have exercised the court's supervisory authority to apply a newly announced rule to the case on appeal is therefore clear. The court has consistently and steadily moved toward more extreme exercises of the power, and has abandoned the guidelines enunciated in *Ubaldi*. As I will explain in part II of this concurring and dissenting opinion, the present case fits this pattern precisely.

Our decisions that have announced new rules prospectively follow a somewhat similar pattern. The court first relied on its supervisory power to impose a new rule on the trial courts in *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989), a case in which the defendant claimed that the state had excluded a potential juror on the basis of race in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The court restricted its exercise of supervisory authority to announcing the new rule prospectively, resolving the merits of the appeal on constitutional principles. Specifically, the court affirmed the defendant's conviction on the basis of its conclusion that he had failed to establish that the state's use of a peremptory challenge was racially motivated. *State* v. *Holloway*, supra, 644–45. After resolving the merits, however, the court stated that it was appropriate to use its supervisory authority to announce a new rule for future cases because the issue of purposeful racial discrimination "is a matter of utmost seriousness, not only for the integrity of a particular trial but also for *the perceived fairness of the judicial system as a whole*." (Emphasis added; internal quotation marks omitted.) Id., 645. Put another way, the court stated, the invocation of its authority was justified because "this issue is of such vital importance to our real and perceived adherence to the rule of law . . . ." Id. Going forward, the court stated, when a defendant claimed pursuant to *Batson* v. *Kentucky*, supra, 476 U.S. 79, that the

state's exercise of a peremptory challenge to exclude a potential juror was based on purposeful racial discrimination, the state would be obligated to provide a race neutral explanation for the challenge without the requirement that the defendant make the prima facie showing required pursuant to *Batson*. *State* v. *Holloway*, supra, 645–46 and 646 n.4.

The decision in *Holloway* did not rest the court's exercise of supervisory authority on any exceptional circumstances presented in the case. Nor could the court have done so, given the different use it made of its authority in *Holloway*. That is, because the court deemed its authority appropriately limited to announcing a prospective rule, it could not justify the exercise of supervisory authority on the exceptional circumstances of the case—if the circumstances were that exceptional, the court would have relied on its authority to reverse the judgment. Nor did the court offer any explanation as to why the rule that it announced in *Holloway* was necessary in order to ensure the perceived fairness of the judicial system, or why it was necessary to announce the rule by way of adjudication rather than allowing the proposed rule to go to the Rules Committee of the Superior Court, a process that would have ensured transparency and allowed the participation of stakeholders and the public.

The court's entire focus in *Holloway* was on the importance of the interest involved—the prevention of purposeful racial discrimination in seating a jury for a criminal trial—to the integrity of the judicial system. In fact, without expressly stating so, *Holloway* established slightly different parameters for the court's exercise of supervisory authority to announce a rule prospectively. That is, the relevant inquiry when the court determines whether to announce a new rule is whether the issue is of vital importance to the perception that the judicial system is fair. It makes sense to apply a different standard when determining whether to announce a rule prospectively—inquiries regarding exceptional circumstances presented in the case at issue are not particularly helpful in determining whether to apply a new rule going forward. A focus on the nature of the issue implicated by the proposed rule, and its importance to the integrity of the judicial system, is more appropriate. A fair question to ask, however, is whether that broad guideline is sufficient to assist the court in exercising any restraint in using its supervisory power to announce new rules. Every criminal trial involves issues that are central to the perceived fairness of the judicial system—does this mean that the court is free to announce a new rule restricting the discretion of trial judges in criminal trials whenever the court believes that it would be a "good idea" to do so?

The court's next exercise of its supervisory authority provides a helpful additional guiding principle for the

invocation of the court's supervisory power. In *State* v. *Patterson*, 230 Conn. 385, 645 A.2d 535 (1994), the court first resolved the merits of the appeal under the applicable constitutional and legal principles. The court concluded that the defendant had waived his claim that the trial judge had improperly been absent during voir dire. Id., 396–97. The court then stated that it would exercise its supervisory authority to require trial judges "to remain on the bench throughout the voir dire of a criminal trial." Id., 397. The court began its explanation as to why supervisory authority was appropriate in the case by emphasizing generally the high stakes at issue in a criminal trial. Id., 398. The court also explained the centrality of its new rule to safeguarding the interests implicated by the important issue: "The uninterrupted supervision of the proceedings by the judicial authority, mindful of everything that transpires in the courtroom, is an important part of the appearance that justice is being done in a criminal case." Id. Finally, although, like *Holloway*, the court engaged in no discussion of the necessity of resorting to the court's supervisory authority, it did weigh the various interests involved, and ultimately determined that the balance favored the exercise of the authority. Id., 400.

*Patterson* provides helpful guidance for the appropriate exercise of our supervisory authority to announce a new rule prospectively. In subsequent decisions, if the court had followed *Patterson* as a model, it would have limited its invocation of supervisory authority to announce a prophylactic rule to those instances when the proposed rule was central to safeguarding the interests implicated by an issue of vital importance to the perceived fairness of the judicial system, after considering any countervailing interests and concluding that the balance weighed in favor of exercising the court's authority.

Because this court's decisions routinely announce rules prospectively pursuant to our supervisory authority with little or no explanation as to why reliance on the power is appropriate, there is no evidence that the court has followed the principles adhered to in *Patterson*, or that it was aware of any need to apply principles consistently when invoking its supervisory power to announce a new rule. For example, within one month after the decision in *Patterson* was issued, the court's decision in *Bennett* v. *Automobile Ins. Co. of Hartford*, 230 Conn. 795, 646 A.2d 806 (1994), did not discuss any limits on the exercise of the power. In *Bennett*, in the context of an uninsured motorist claim appeal that challenged the trial court's order of remittitur, this court relied on its supervisory authority to announce a prospective rule requiring insurers to "raise issues of policy limitation, even when undisputed, by special defense." Id., 806. The opinion offered no justification whatsoever for the reliance on the authority, merely stating vaguely that it exercised its authority "[i]n view of the issues

raised by this appeal . . . ." Id.

The court's subsequent decisions announcing new rules that apply prospectively have taken a path that is largely rudderless, so lacking in direction that it is difficult to characterize them with any conciseness. In some cases, the court has adhered to the principle that our power to announce prospective rules should be reserved for issues that are of vital importance to the perceived fairness of the judicial system. See, e.g., *State* v. *Brown*, supra, 235 Conn. 525–28 (requiring trial courts to conduct preliminary inquiry into facially credible allegations of juror misconduct in criminal case, and justifying invocation of supervisory power on importance of right to trial by jury in criminal case and responsibility of trial judge to ensure that criminal defendant receives fair trial).[11] In other instances, the court appears to have relied on the "disturbing" facts of the particular case to announce the prophylactic rule. See, e.g., *State* v. *Ouellette*, 295 Conn. 173, 189–92, 989 A.2d 1048 (2010) (relying on "disturbing" discrepancies between state's representations at trial regarding deal offered to state's witness and state's conduct during witness' sentencing hearing, to invoke supervisory authority to require sentencing courts to inquire regarding nature of plea agreements when state attests to cooperation, and representations made about agreements during trials at which witness testified).

Many decisions have offered no explanation as to why it is appropriate to rely on the court's supervisory authority. See, e.g., *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 283, 32 A.3d 318 (2011) (relying on supervisory authority to require trial judges to expressly set forth in memorandum of decision "clear, definite and satisfactory" reasons to justify remittitur [internal quotation marks omitted]). Other decisions have vaguely alluded to broad principles, without providing a more specific explanation as to why it was appropriate to invoke our supervisory power in the given context. See, e.g., *Duperry* v. *Solnit*, 261 Conn. 309, 326, 329, 803 A.2d 287 (2002) (requiring trial court to canvass defendant, when defendant has entered plea of not guilty by reason of mental disease or defect and state agrees with defendant's claim, explaining that invocation of supervisory power is "appropriate, in light of concerns of fundamental fairness").

Among the decisions that have announced new rules, those that have announced prospective changes to jury instructions appear to form a particular subset, in which the court routinely and consistently has required little to no justification for the exercise of supervisory authority. See, e.g., *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002) (directing trial courts "to refrain from instructing jurors that one who uses a deadly weapon on the vital part of another will be deemed to have intended the probable result of that act and that

from such a circumstance the intent to kill properly may be inferred" [internal quotation marks omitted]); *State* v. *Griffin*, 253 Conn. 195, 205, 209–10, 749 A.2d 1192 (2000) (barring use of charge providing that, "[i]f two conclusions can reasonably be drawn from the evidence, one of innocence and one of guilt, you must adopt the one of innocence"). Although one certainly can imagine reasons why a lower barrier may be appropriate in this context, the court has never offered any indication that it has intentionally adhered to a different standard when announcing rules governing jury instructions.

Only recently, in *State* v. *Carrion*, 313 Conn. 823, 100 A.3d 361 (2014), the court expressly articulated a new standard for the invocation of our supervisory authority to announce new rules. According to the decision in *Carrion*, the only requirement is that the court deem such exercise of its authority to be "appropriate" or, in other words, dictated by "prudence and good sense . . . ." Id., 852. The court specifically rejected the suggestion that supervisory authority may be used to announce a new rule only when its use is rendered "necessary." Id., 851. Additionally, the court stated that in this context, "there is no need for this court to justify the use of extraordinary measures prior to exercising its supervisory authority." Id., 852. As support, the court looked primarily to decisions in which we have announced prospective changes to jury instructions. Id., 852–53. As I already have explained, however, those decisions are not representative of the entirety of this court's decisions announcing new rules prospectively. The standard announced in *Carrion*, if followed by the court, would further threaten the predictability that is essential to the rule of law, because it sets the bar too low. When we first invoked our supervisory authority in *Ubaldi*, we made it clear that the power should be used in the rare instance. If we rely on mere prudence and good sense as the trigger, we have abandoned the guidelines that we set for ourselves thirty years ago.

The history of the court's exercise of supervisory authority, both in announcing new rules to be applied prospectively and in announcing new rules to be applied to the pending appeal, demonstrates that the court has not engaged in any meaningful consideration of what the appropriate guidelines governing our exercise of that power should be. The result is the current explosion of decisions by this court invoking the exercise of its supervisory authority, without any consensus as to appropriate guidelines for restraint. The history of this court's decisions that invoked its supervisory authority supports the conclusion that this court should be guided in its exercise of that authority by *State* v. *Patterson*, supra, 230 Conn. 397–400, and *State* v. *Ubaldi*, supra, 190 Conn. 572–73. That is, the court should announce new rules with prospective application only when the proposed rule is central to safeguarding the interests

implicated by an issue of vital importance to the perceived fairness of the judicial system, after considering any countervailing interests and concluding that the balance weighed in favor of exercising the court's authority. *State* v. *Patterson*, supra, 397–400. As for the application of new rules to pending appeals, the court should apply a newly announced rule to the pending appeal only when its exercise is necessary because traditional protections are inadequate, when the interests involved are of the utmost importance to the perceived fairness of the judicial system as a whole, when retroactive application of the rule is justified by exceptional circumstances presented in the pending case, and an evaluation of the interests involved reveals that the balance weighs in favor of invoking the authority. *State* v. *Ubaldi*, supra, 572–73.

## II

### APPLICATION TO THE PRESENT CASE

Applying the standard established in *State* v. *Ubaldi*, supra, 190 Conn. 572–73, to the present case leads to the conclusion that this court should decline to exercise its supervisory authority. Although the interests involved are of the utmost importance, there are no exceptional circumstances in the present case, and traditional protections were adequate to safeguard the respondent's rights. Additionally, the countervailing interests involved in the present case are powerful—the interest that the children have in a permanent placement without any additional delay counsels against invocation of the court's supervisory authority. Accordingly, the exercise of that authority in the present case is inappropriate.

It is significant that in the present case the majority's unequivocal conclusion, that the respondent's right to due process was not violated by the trial court's failure to personally canvass her before taking the case on the papers, is grounded on a logical, objective constitutional analysis. The majority properly weighs the three factors set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), and concludes that due process does not require the trial court to conduct a personal canvass prior to accepting a parent's waiver of the right to present evidence and testimony in opposition to a termination petition, and to object to the admission of exhibits in support of the termination petition. The United States Supreme Court crafted the three-pronged *Mathews* test in light of its recognition that "due process is flexible and calls for such procedural protections as the particular situation demands." (Internal quotation marks omitted.) Id., 334. Accordingly, the court's test was formulated to allow courts to consider the particular circumstances presented in a case in determining the process that is constitutionally due under those circumstances. The rule is designed to adapt to individual circumstances. The three *Mathews*

factors are: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id., 335.

The record in the present case reveals that the majority properly evaluated the three *Mathews* factors in reaching its conclusion that the respondent received all of the process that was constitutionally due to her. The process afforded to the respondent in the present case ensured that, when she waived her right to proceed to trial and to contest the exhibits presented by the petitioner, she did so knowingly, intelligently and voluntarily. In fact, that decision is perfectly consistent with the strategy employed throughout the extensive and lengthy course of proceedings provided to the respondent. Additionally, beside the lack of any allegation that her counsel was ineffective, there is no indication in the record that at any point in time the respondent experienced any difficulty communicating with counsel or expressed any dissatisfaction with her representation.

The majority accurately describes the importance of the private interest at issue in the present case. This court has recognized that parents have a fundamental right to rear their children. *Roth* v. *Weston*, 259 Conn. 202, 213, 789 A.2d 431 (2002). The United States Supreme Court has stated that "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). That court has emphasized that even when familial "relationships are strained," the importance of the parents' fundamental right to raise their children is not diminished: "If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the [s]tate moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky* v. *Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

Although I agree with the majority that the second *Mathews* factor, which requires the court to consider "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; *Mathews* v. *Eldridge*, supra, 424 U.S. 335; favors the petitioner, I observe that the majority only generally identifies the current procedural protections in place.

Because I believe that the extensive nature of the existing procedural protections available to a parent during the termination process is relevant to the question of whether it is necessary in the present case to exercise our supervisory authority, I discuss those existing protections in greater detail than does the majority.

As happens in the vast majority of termination cases, the route that the present case followed prior to the termination of the respondent's parental rights was not a quick one. Along the way, the respondent participated in numerous proceedings designed to achieve a balance between the respondent's fundamental right to parent her children and society's duty to protect the best interests of children. It is significant that the two years during which the respondent was involved in the proceedings to determine whether she would retain her right to parent her two children did not mark the first time that she traveled this route. In 2007, with her consent, her parental rights with respect to her older three children already had been terminated. Those children subsequently were adopted by the their maternal great-grandmother.

The record reflects that on September 21, 2011, the petitioner invoked a ninety-six hour hold on behalf of the children, Yasiel R. and Sky R., and removed them from the respondent's care, on the basis of a petition of neglect. See General Statutes § 17a-101g (e) and (f). Immediately upon the removal of the children from the respondent's custody, the procedures designed to protect her rights were triggered. On the day that the children were removed, Rosiris Espejo, the social worker for the department who was assigned to the case, provided the respondent with a copy of the petitioner's ninety-six hour hold. Espejo attempted to discuss other relative resources with whom the children could be placed, but the respondent refused to speak to her.

On September 23, 2011, the respondent was served with copies of the notice of temporary custody and order to appear, the petitioner's motion seeking an ex parte order of temporary custody pursuant to § 17a-101g (e) and (f) (ninety-six hour hold), Espejo's supporting affidavit, the neglect petition and the summary of facts substantiating the neglect petition, and specific steps. The notice of temporary custody and order to appear informed the respondent of the basis for the children's removal, and notified her of the date of the preliminary hearing on the neglect petition and motion for temporary custody. The notice also informed the respondent that she would have the opportunity to present her position to the court, that she had the right to remain silent, and the right to counsel, which would be appointed for her if she could not afford an attorney.

The neglect petition represented that the children

were neglected on the basis that they were "being denied proper care and attention, physically, educationally, emotionally or morally," and that they were being "permitted to live under conditions, circumstances or associations injurious to their well-being." The petition informed the respondent that a hearing would be held on the petition, and it provided a date, time and place of the hearing. It also informed the respondent that if she failed to appear, the court could find the children neglected, uncared-for or abused. The preliminary specific steps provided to the respondent in order for her to regain custody of the children required her to keep all appointments set by or with the department, to successfully complete a parenting program, to accept in-home services referred by the department and to cooperate with the service providers, to submit to a substance abuse evaluation and follow recommended treatment, to submit to random drug testing, to refrain from using illegal drugs or abusing alcohol or medicine, to cooperate with court-ordered evaluations or testing, to sign releases allowing the department to communicate with service providers and with the children's attorney or guardian ad litem, to obtain or maintain adequate housing and a legal income, to notify the department of changes in the make-up of the household, to not become involved with the criminal justice system, and to take care of the children's physical, educational, medical or emotional needs. The specific steps provided for the respondent to have supervised visitation with the children.

On September 27, 2011, the court held a hearing to determine whether to order temporary custody to the petitioner. At that hearing, the court appointed counsel for the respondent. The court found that the respondent had been served with notice of the petition of neglect, and had been advised of her rights. The court canvassed the respondent, who agreed to sustain the order committing the children to the temporary custody of the petitioner, and indicated that she wished to participate in the Recovery Specialist Voluntary Program, a program for parents for whom substance abuse is identified as one of the factors in the removal of their children. The court issued an order granting temporary custody to the petitioner and allowing the respondent supervised visitation.

The hearing on the petition for neglect took place on February 8, 2012, at which time the respondent, who was represented by counsel, entered a plea of nolo contendere. In her plea, the respondent alleged that the neglect petition had been read to her and that she had been advised of her rights, including her rights to a trial, to an attorney, and to disagree with any claims in the petition. She further stated that she voluntarily exercised her right not to contest the claims in the petition, and elected to exercise her right to remain silent without any admission of responsibility under the

petition as to its allegation that the children had been permitted by the respondent to live under conditions, circumstances or associations injurious to their well-being. The court accepted the respondent's plea and the children were adjudicated neglected and committed to the custody and care of the petitioner. At that time, the court provided specific steps to the respondent that were substantially similar to the initial specific steps that had been provided to her on September 23, 2011. An additional specific step provided to the respondent was that she was required to take part in individual counseling with Generations Behavioral Health. The court also ordered the petitioner to file a motion for review of a permanency plan.

On June 6, 2012, the petitioner filed a motion to review the permanency plan, which had a stated goal of the termination of the parental rights of both the respondent and the father, and the adoption of the children. The respondent did not file an objection to the motion,[12] and did not oppose it at the hearing on the motion on September 5, 2012. At that hearing, the court approved the permanency plan goal of termination of parental rights and adoption.

On November 21, 2012, the petitioner filed this petition for termination of the respondent's parental rights, and, on May 23, 2013, filed another motion to review the permanency plan, which was again approved by the court. The respondent filed an objection to the permanency plan on June 19, 2013, claiming that she was complying with the specific steps ordered by the court, and arguing that termination of her parental rights was not in the best interests of the children. She subsequently withdrew her objection, and moved for an individual psychological evaluation, which request was approved by the court.

The hearing on the petitioner's motion for termination of parental rights was set for November 12, 2013. The original summons that was sent to the respondent for the hearing on the termination of parental rights explained the effect of a termination decree: "The termination decree will be the complete end of the legal relationship between the child . . . and the person(s) whose parental rights have been terminated so that the child . . . is free for adoption . . . . The parent will have no legal right or responsibility to care for the child . . . or make any decisions on behalf of the child . . . to obtain the child's . . . birth certificate or any state or federal benefit. The parent will have no legal responsibility to support or to pay for the child's . . . expenses after the effective date of the termination. The child . . . will be legally free for adoption after the termination and the parent will have no right to notice of the adoption proceedings nor any right to participate in the proceedings."

The extensive process provided to the respondent

demonstrates that she was notified of her rights at every opportunity, and given every protection under the law. Given the repeated notice provided to the respondent of the effect of a judgment of termination, the respondent's active participation in the proceedings, and the fact that she was represented by counsel, I agree with the majority that the record does not demonstrate that the existing procedures create a risk of an erroneous deprivation of parental rights. Additionally, because the record demonstrates that the respondent was repeatedly advised of her rights, it would be unreasonable to conclude that a personal canvass by the trial court likely would have reduced the risk of erroneous deprivation of her rights. The second factor of the *Mathews* test is determinative in the present case—the respondent received the process that she was due.[13] See *Mathews* v. *Eldridge*, supra, 424 U.S. 335.

Applying the guidelines that this court established in *State* v. *Ubaldi*, supra, 190 Conn. 572–73, I conclude that the only factor supporting the exercise of our supervisory authority is that the issue involved is an important one. None of the remaining factors, however, support the invocation of the court's supervisory authority. Under these facts, it is not surprising that the majority fails to rest its decision to exercise its supervisory authority to reverse the Appellate Court's judgment on any extraordinary circumstances presented in the case—there are none. There is no indication that the respondent was deprived of her rights, or that the termination of her parental rights involved any fundamental unfairness. There is also no indication that it is in any way necessary to resort to the court's supervisory authority. In fact, the record suggests precisely the opposite. Traditional remedies provided the respondent with adequate protection. It is also quite telling that the majority fails to give any consideration to the countervailing interests in the present case, which are particularly compelling and counsel against reversing the judgment. The interest of the children in being permanently placed without additional delay clearly outweighs the majority's theoretical concerns regarding fairness to the respondent. Viewed under the guidelines that this court first set forth in *Ubaldi*, this appeal presents a particularly inappropriate circumstance in which to exercise the court's authority to reverse the judgment.

Finally, even if the majority had restricted its supervisory authority to an announcement of a new prospective rule, that exercise of authority would still be improper under the circumstances of this case. As I explained earlier in this concurring and dissenting opinion, the court should exercise its supervisory authority to announce a new rule only when the proposed rule is central to safeguarding the interests implicated by an issue of vital importance to the perceived fairness of the judicial system, after considering any countervailing

interests and concluding that the balance weighed in favor of exercising the court's authority. See *State* v. *Patterson*, supra, 230 Conn. 385. Although the issue is important, there is no indication that the majority's proposed rule is central to safeguarding the interests implicated by the issue or that the exercise is appropriate when weighed against countervailing interests. Specifically, there has been no showing that parents who are represented by counsel in termination proceedings are likely to unknowingly, unintelligently or involuntarily waive their right to trial or their right to contest exhibits offered by the department in favor of termination. As the present case demonstrates, the proceedings available to parents are designed to protect their right to retain custody of their children and to inform them of the services and proceedings available to them to enable them to do so. Without some indication in the record of conflict, lack of communication or dissatisfaction with the representation provided by counsel to parents in termination proceedings, there is simply no need for a personal canvass. The issue of whether to require a canvass properly should have been left to the Rules Committee of the Superior Court. The majority's rule, therefore, is unnecessary, and improperly substitutes its judgment for the discretion of trial judges.

Although I concur with and join parts I and II of the majority opinion, for the foregoing reasons, I respectfully dissent from part III of that opinion.

[1] Although the Commissioner of Children and Families filed separate petitions and certain other supporting documents discussed herein on behalf of each of the two children who are the subject of this appeal, Yasiel R. and Sky R., and, in some instances, certain affidavits were made and studies conducted in the name of both children, for purposes of clarity, we refer to these documents in the singular.

[2] It is instructive to observe what the court in *Ubaldi* did *not* rely on to justify its newly recognized power. That is, the court did not rely on Practice Book § 60-2, formerly Practice Book (1978–97) § 4183, to justify its claim to possess "inherent supervisory power." See Practice Book § 60-2 ("[t]he supervision and control of the proceedings on appeal shall be in the court having appellate jurisdiction"). By not looking to the authority of the court to supervise the appellate process to justify the power it invoked in *Ubaldi*, the court drew a distinction between the two types of authority—the authority to supervise the proceedings before this court on appeal pursuant to the rules of practice, and the authority to supervise the proceedings at the lower courts, pursuant to *Ubaldi*. The derivation of our supervisory power in *Ubaldi*, therefore, is distinct in origin from the court's authority pursuant to the rules of practice.

I observe that our decisions have not always been clear, when invoking this court's supervisory authority, whether that authority is grounded in the rules of practice, or derived from this court's decision in *Ubaldi*, and instead have conflated the two types of authority. See, e.g., *In re Jonathan M.*, 255 Conn. 208, 236, 764 A.2d 739 (2001) (declining request that court exercise supervisory authority to remand case for further evidentiary hearings and to retain jurisdiction of appeal, which request implicated court's authority under Practice Book § 60-2; rather than citing to rules of practice, court cited as authority *State* v. *Andrews*, 248 Conn. 1, 20, 726 A.2d 104 [1999], which involved denial of request to exercise of supervisory authority to reverse conviction on basis of prosecutorial improprieties).

[3] As a possible explanation for the court's evolution in its understanding of its role, Beale offers the observation that *McNabb* was decided three years after legislation authorized the Supreme Court to promulgate rules of criminal procedure and two years after the court decided *Sibbach* v. *Wilson & Co.*, 312 U.S. 1, 14–16, 61 S. Ct. 422, 85 L. Ed. 479 (1941), which upheld the

validity of rules 35 and 37 of the recently promulgated Federal Rules of Civil Procedure. A. Beale, supra, 84 Colum. L. Rev. 1444–45 and 1445 nn.74 and 75.

[4] For an excellent discussion of the lack of statutory and constitutional underpinnings for the "inherent supervisory authority" of the Supreme Court, see A. Barrett, supra, 106 Colum. L. Rev. 344–52. Barrett reviews several theories of constitutional sources of supervisory authority, and explains why each is inconsistent with the historical context at the time that the constitution was ratified.

[5] Providing a definitive number of decisions in which we have invoked our supervisory power is complicated by several factors. Sometimes, for example, the majority decision has not expressly invoked the court's supervisory power, but a dissenting opinion nonetheless claims that the majority relied on it. See, e.g., *State* v. *Couture*, 194 Conn. 530, 568, 482 A.2d 300 (1984) (*Healey, J.*, dissenting), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). In other instances, a subsequent decision characterizes an earlier holding as having implicitly rested on the court's supervisory authority. See, e.g., *State* v. *Elson*, supra, 311 Conn. 771 n.31 (characterizing decision in *State* v. *Cohane*, 193 Conn. 474, 499–500, 479 A.2d 763, cert. denied, 464 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 [1984], as exercise of supervisory authority, despite fact that *Cohane* purported to discuss supervisory authority only in dicta); *Tanzman* v. *Meurer*, 309 Conn. 105, 116, 70 A.3d 13 (2013) (characterizing decision in *Krafick* v. *Krafick*, 234 Conn. 783, 804, 663 A.2d 365 [1995], as invocation of court's supervisory authority). Additionally, as I explain in footnote 2 of this concurring and dissenting opinion, this court increasingly has conflated its supervisory authority over the appellate process pursuant to Practice Book § 60-2 with the supervisory authority over the lower courts that it announced in *Ubaldi*. I have not included, in my summary of this court's invocation of its supervisory authority, the decisions in which the court invoked its supervisory authority over the appellate proceedings. I observe, however, that the line between the two types of authority is not always clear. For example, it could be argued that exercises of supervisory authority pursuant to *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 123, pertain to this court's supervision over the appellate proceedings, and, therefore, could be characterized as an exercise of authority pursuant to § 60-2. My view, however, is that, although reviewing issues pursuant to *Blumberg Associates Worldwide, Inc.*, pertains to this court's supervision of the appellate proceedings, the exercise of authority goes beyond that which is contemplated by the rules of practice, and, therefore, I treat those decisions as an exercise of this court's supervisory authority announced in *State* v. *Ubaldi*, supra, 190 Conn. 570.

See *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Smith*, 207 Conn. 152, 162, 540 A.2d 679 (1988); *State* v. *Chung*, 202 Conn. 39, 44, 519 A.2d 1175 (1987); *State* v. *Ubaldi*, supra, 190 Conn. 570.

See *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 (1999); *State* v. *Schiappa*, 248 Conn. 132, 168, 728 A.2d 466 (1998), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); *Ireland* v. *Ireland*, 246 Conn. 413, 420–21, 717 A.2d 676 (1998); *State* v. *Santiago*, supra, 245 Conn. 301; *State* v. *Coleman*, 242 Conn. 523, 534, 700 A.2d 14 (1997); *State* v. *Gould*, 241 Conn. 1, 9, 695 A.2d 1022 (1997); *State* v. *Taylor*, 239 Conn. 481, 504, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995); *State* v. *Breton*, 235 Conn. 206, 250, 663 A.2d 1026 (1995); *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995); *State* v. *Garcia*, 233 Conn. 44, 91, 658 A.2d 947 (1995); *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 149, 653 A.2d 798 (1995); *Bennett* v. *Automobile Ins. Co. of Hartford*, 230 Conn. 795, 806, 646 A.2d 806 (1994); *State* v. *Patterson*, 230 Conn. 385, 390, 397–98, 400, 645 A.2d 535 (1994).

[6] See *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Smith*, 207 Conn. 152, 162, 540 A.2d 679 (1988); *State* v. *Chung*, 202 Conn. 39, 44, 519 A.2d 1175 (1987); *State* v. *Ubaldi*, supra, 190 Conn. 570.

[7] See *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 (1999); *State* v. *Schiappa*, 248 Conn. 132, 168, 728 A.2d 466 (1998), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); *Ireland* v. *Ireland*, 246 Conn. 413, 420–21, 717 A.2d 676 (1998); *State* v. *Santiago*, supra, 245 Conn. 301; *State* v. *Coleman*, 242 Conn. 523, 534, 700 A.2d 14 (1997); *State* v. *Gould*, 241 Conn. 1, 9, 695 A.2d 1022 (1997); *State* v. *Taylor*, 239 Conn. 481, 504, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995); *State* v. *Breton*, 235 Conn. 206, 250, 663 A.2d 1026 (1995); *State* v. *Jones*,

234 Conn. 324, 346–47, 662 A.2d 1199 (1995); *State* v. *Garcia*, 233 Conn. 44, 91, 658 A.2d 947 (1995); *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 149, 653 A.2d 798 (1995); *Bennett* v. *Automobile Ins. Co. of Hartford*, 230 Conn. 795, 806, 646 A.2d 806 (1994); *State* v. *Patterson*, 230 Conn. 385, 390, 397–98, 400, 645 A.2d 535 (1994).

[8] See *State* v. *Arroyo*, 292 Conn. 558, 575, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010); *State* v. *Connor*, 292 Conn. 483, 506, 973 A.2d 627 (2009); *State* v. *Gore*, 288 Conn. 770, 786–87, 955 A.2d 1 (2008); *State* v. *Ledbetter*, 275 Conn. 534, 547, 570, 575, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); *State* v. *Padua*, 273 Conn. 138, 178, 869 A.2d 192 (2005); *Duperry* v. *Solnit*, 261 Conn. 309, 312, 326–27, 329, 803 A.2d 287 (2002); *State* v. *O'Neil*, 261 Conn. 49, 74, 801 A.2d 730 (2002); *State* v. *Payne*, 260 Conn. 446, 450–53, 797 A.2d 1088 (2002); *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002); *Roth* v. *Weston*, 259 Conn. 202, 232, 789 A.2d 431 (2002); *State* v. *Revelo*, 256 Conn. 494, 502–504, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001); *State* v. *Griffin*, 253 Conn. 195, 209–10, 749 A.2d 1192 (2000).

[9] In addition to today's decision, see *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 268–72; *State* v. *Carrion*, 313 Conn. 823, 851–53, 100 A.3d 361 (2014); *State* v. *Elson*, supra, 311 Conn. 730, 777; *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 169; *Kervick* v. *Silver Hill Hospital*, 309 Conn. 688, 710, 72 A.3d 1044 (2013); *Tanzman* v. *Meurer*, 309 Conn. 105, 117, 70 A.3d 13 (2013); *State* v. *Medrano*, 308 Conn. 604, 606–607, 631, 65 A.3d 503 (2013); *State* v. *Polanco*, 308 Conn. 242, 245, 248, 255, 260, 61 A.3d 1084 (2013); *State* v. *Rose*, 305 Conn. 594, 605–606, 46 A.3d 146 (2012); *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 283, 32 A.3d 318 (2011); *State* v. *Pena*, 301 Conn. 669, 683–84, 22 A.3d 611 (2011); *In re Joseph W.*, 301 Conn. 245, 268, 21 A.3d 723 (2011); *State* v. *Ouellette*, 295 Conn. 173, 191, 989 A.2d 1048 (2010).

[10] In addition to those two categories, there are two decisions in which we have relied on our authority to deter prosecutorial misconduct. See *State* v. *Payne*, 260 Conn. 446, 450–53, 797 A.2d 1088 (2002); *State* v. *Ubaldi*, supra, 190 Conn. 570–75. Finally, in a small number of cases, we have relied on our supervisory authority to address claims that would otherwise be unreviewable. See, e.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 169; *State* v. *Revelo*, 256 Conn. 494, 503, 775 A.2d 260, cert. denied, 534 U.S. 1052, 122 S. Ct. 639, 151 L. Ed. 2d 558 (2001); *State* v. *Smith*, 207 Conn. 152, 162–63, 540 A.2d 679 (1988); *State* v. *Chung*, 202 Conn. 39, 44, 519 A.2d 1175 (1987).

[11] In *State* v. *Elson*, supra, 311 Conn. 770 n.30, this court incorrectly categorized the decision in *State* v. *Brown*, supra, 235 Conn. 502, as one in which we applied a newly announced rule to reverse the judgment at issue in the appeal. Actually, in *Brown*, the court reversed the judgment on the basis of its conclusion that the trial court abused its discretion in failing to conduct a sua sponte preliminary inquiry. Id., 525–26. The court reserved its reliance on its supervisory authority for announcing the new rule. As in other cases in which the court had remanded a case on other grounds at the same time that it adopted a new rule, however, the court directed that on remand to the trial court, the new rule must be applied. Id., 532; see, e.g., *State* v. *Breton*, 235 Conn. 206, 249–50, 663 A.2d 1026 (1995) (in decision reversing death sentence on other grounds, announcing new rule requiring special verdict form in death penalty cases, and instructing that new rule should be applied on remand).

[12] The father filed an objection to the proposed permanency plan, which he subsequently withdrew.

[13] I agree with the majority that the third *Mathews* factor, which considers the government's interest in the proceeding and the fiscal and administrative burdens attendant to increasing procedural requirements, is neutral. See *Mathews* v. *Eldridge*, supra, 424 U.S. 335.